Earl **HARBISON**, Plaintiff,

v.

Elizabeth **DOLE**, Secretary, United States Department of Transportation, Defendant.

Civ. A. No. 77–K–866.

United States District Court, D. Colorado.

Nov. 9, 1983.

Eugene Deikman, Denver, Colo., for plaintiff.

Robert N. Miller, U.S. Atty., Henry L. Solano, Asst. U.S. Atty., Denver, Colo., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KANE, District Judge.

This action was tried to the court for three days commencing January 31, 1979 and concluded following a protracted recess on February 15, 1979. On September 20, 1979 I entered findings of fact and conclusions of law, and on January 25, 1980 made additional findings of fact and conclusions of law and entered judgment in favor of the plaintiff and against the defendant. The defendant appealed the judgment. On November 17, 1982 the United States Court of Appeals for the Tenth Circuit reversed and remanded the case to this court.

On December 15, 1982, at a status conference, after the plaintiff represented that he would rest on the record, I ordered the defendant to file an offer of proof as to additional evidence the defendant proposed to submit at the retrial of the factual issues of the case. On February 22, 1983 the defendant elected to rest on the record as established in the trial held previous to the remand by the Court of Appeals. The defendant further moved that Elizabeth Dole be substituted for Neil Goldschmidt as Secretary for the United States Department of Transportation. On February 23, 1983 I granted the motion to substitute and directed the parties to submit any proposed findings of fact and conclusions of law that they deemed advisable.

Jurisdiction was admitted pursuant to the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16(c).

The plaintiff was and is a black employee of the United States Department of Transportation working as an Air Traffic Control Specialist at the Denver Flight Service Station, Federal Aviation Administration. On October 22, 1976, the plaintiff submitted an Administrative Complaint of Discrimination to the Department of Transportation alleging discrimination and failure to promote within the Federal Aviation Administration. More than 180 days had elapsed since the signing of the Administrative Complaint and final action had not been taken on the complaint.

Plaintiff is an Air Traffic Control Specialist, GS–11, employed at the Denver Flight Service Station, Denver, Colorado. In the Denver Flight Service Station, the highest grade obtained by a black was the grade of GS–11. That position is held by the plaintiff.

On August 5, 1976, a job announcement for position of Assistant Chief, GS–12, at the Denver Flight Service Station (FSS), Colorado, was issued by Paul E. Okum, a Personnel Staffing Specialist of the FAA. The announcement stated that bids received after August 24, 1976 would be returned. The duties to be performed were responsibility for conducting operations on a specific shift in a level III, Flight Service Station. (The FAA ranks flight service stations on three levels, level one being the smaller and level three being the larger stations.) Flight assistance was to be provided to air carriers, general aviation, student and military pilots, and included giving information on weather, routes of flight, airport services available, providing emergency assistance to pilots in distress, and supervising air traffic controllers of the assigned shift. The job announcement required that the applicant's total experience and training must show evidence of ability to perform supervisory work. "Non-supervisory personnel must submit RM Form 3330–13, Supplementary Experience Statement for a Supervisory Position, through your supervisor, in addition to all other requested forms." The announcement also stated: "Applicants will be considered regardless of age, marital status, non-disqualifying physical handicap, or political or labor organization affiliation or non-affiliation." No mention was made of consideration regardless of race. The area of consideration for applicants was the Rocky Mountain Region.

The Rocky Mountain Region is an area consisting of the states of Colorado, Utah, Wyoming, Montana, North Dakota and South Dakota.

In his present position as an Air Traffic Control Specialist at the Denver FSS, which is located at Stapleton International Airport in Denver, Colorado, the plaintiff is concerned with en route weather analysis, en route in-flight assistance, facility coordination, en route weather displays and related journeyman duties. En route weather analysis consists of analyzing the weather and transmitting this information to the pilot as needed. The information is obtained from teletype, satellite photos, fax machines and Does photographs of a quadrant of the earth. En route in-flight assistance consists of providing up-to-date information pertinent to a particular type of aircraft going to a particular destination. During bad weather, there is a considerable amount of pre-flight over-the-telephone briefing. There are radio transmitters and receiver sites at Limon, Cheyenne, Pueblo, Aspen and Steamboat Springs, with which the plaintiff communicates. En route weather displays consisting of taking weather off of the various machines and displaying it where the other Air Traffic Control Specialists can see it. The plaintiff has learned to interpret the meteorological data by attending schools and taking correspondence courses since he has been in the FAA. His latest certificate and training record for Does satellite shows that he completed 48 hours of training on January 23, 1979 at Oklahoma City. He received his Pilot Weather Briefings Certificate on October 1, 1968, his En Route Flight Advisory Service on January 29, 1976 and has numerous other certificates of training in connection with his duties.

On September 24, 1976, Steven Dyke, a non-black male, was selected for the Assistant Chief position at the Denver FSS, the job announced on August 5, 1976. The plaintiff was the only black who applied for this position.

On October 22, 1976, plaintiff filed a complaint with the defendant charging that he had not been selected for this position because of his race and color; that his nonselection constituted the most recent instance in which he was passed over for promotion because of race and color; that

his ratings for promotion were graded low on a subjective basis and that the Merit Promotion Plan contains no protection for blacks so far as rating, ranking and selecting employees are concerned.

Plaintiff is 47, married, with four children and a stepdaughter, and owns a home in Denver. He received a GED in West Virginia in 1952, and served honorably in the U.S. Air Force from 1951 to 1955, where he worked as an Air Traffic Controller for 28 months, basically instructing other students in air traffic control and warning procedures. Radar and radio communication with pilots, the control center and the regional center were employed. He worked as a mobile tower operator at Luke Air Force Base in Phoenix, Arizona, for 13 months controlling visual traffic. In Lima, Ohio, he applied for an Air Traffic Control Specialist position with the defendant, and accepted the job on June 1, 1959 in Denver. He was sent to the Aeronautical Academy in Oklahoma City, Oklahoma for a six-week course in the basics of air traffic control. The Denver Center was in Longmont, where air traffic control consisted of controlling aircraft in instrument flight rules, from private to passenger to military aircraft, either coming into Denver and flying to other destinations or overpassing Denver or landing in Denver and going on to another location. Craft were controlled according to a manual separating the times and distances between aircraft. As an Assistant Controller, the plaintiff prepared strips which indicated when airplanes were supposed to be over a certain point at a certain time at a certain altitude. The Longmont Air Traffic Control Center performs this work, and the Denver Flight Service Station, where the plaintiff is now stationed, does not do actual control work but is concerned with weather analysis and flight assistance.

When the plaintiff completed his air traffic control training on April 11, 1963, he was evaluated for six weeks under actual traffic conditions in Longmont. There were no positions for controllers at that time. He remained an Assistant Controller

from April 11, 1963 to May, 1967, when he was part of a promotion of a group of 20. An assistant controller prepares the strips and assists the actual controller. There were about 270 controllers and 40 assistants in 1963. In order to maintain proficiency, the assistants were assigned at least one day of actual control work a week. As the only black assistant, plaintiff was never given the opportunity of maintaining proficiency by doing one day of actual control work a week while non-black assistants were given this opportunity. A departmental complaint filed by him on June 4, 1969 resulted in a decision in his favor on August 26, 1971, which adverted to his claim that "management had denied him training between 1963 and 1967 which caused him to lack the proficiency to perform well after promotion to GS–10 and entrance into radar control training." The decision found the claims substantiated. Several non-blacks among the assistants were advanced to controller positions before the promotion of the group of 20. In 1963, for example, the plaintiff directed a white person how to apply for an assistant job; that man trained long after the plaintiff had, did not have as much experience as the plaintiff, and was selected to a controller's position before he was. About 20 non-blacks, who came in after the plaintiff, completed their training after he did and became controllers before he did. When promoted with the group, in April, 1967, he took a two week course in radar, and then was expected to control airplanes. The others promoted at the same time had maintained proficiency, while the plaintiff had not. He felt that he needed basic manual training all over again, since he did not feel confident to handle control aircraft after a four-year hiatus of actual work. The plaintiff asked the Chief of the Longmont Center for a transfer to the Denver FSS, which meant that as a GS–10, he would take a demotion to a GS–9. He was informed by the chief that the transfer would be permanent, but when he reported to the station in September, 1967, the Station Chief informed him there was no job there and that after completing a three-month training for the major job assignments, he would have to take a position in Akron, Laramie, or Trinidad, and take his chances on getting back to the Denver FSS. When he learned that his job at the Denver FSS was not permanent, the plaintiff was discouraged and considered quitting, however, he changed his mind and wrote the Denver Chief asking to be reinstated into controller training and to be given three to five weeks manual control problems to requalify. The Denver Chief refused, although he had given certain other individuals, including Steven Dyke, a chance to requalify after they had exhausted their training. The departmental decision referred to above states:

> Complainant was repeatedly passed over for promotion between 1963 and 1967 although after becoming a GS–8, he was area rated in about the average time. He was demoted within 30 days of his request but he was not reassigned for flight service training for eight months whereas other employees making similar requests were demoted at the time of their reassignment. He worked flight data during the eight-month period as a GS–8 while others were allowed to carry out the same duties as GS–10's. The above occurred at the Center although Center policy permitted employees to work flight data as GS–10's and permitted employees to retain their GS–10 rating until reassigned to flight service training. He was denied reinstatement to radar control training although he had not failed at the time of his request to withdraw whereas other employees making similar requests were reinstated.

In January, 1969, five GS–11 journeymen vacancies were advertised under the merit promotion program in the Denver area. The advertisement permitted GS–9's with less than one year in-grade to apply. On April 11, 1969, the five vacancies were advertised region wide. The plaintiff applied both times, but was not selected.

On June 4, 1969, the plaintiff filed a discrimination complaint alleging that management, by controlling the rating, ranking

and selecting of employees, had denied him promotion between 1963 and 1967; that management had denied him training which caused him to lose proficiency, and that management had failed to promote him non-competitively to the journeyman level which had been promised when he was assigned to the Denver FSS. However, after completing his training at the Denver FSS, he was transferred to Laramie, Wyoming, on December 1, 1969. His wife and children continued to reside in the home which he owned in Denver. In Laramie, plaintiff was an Air Traffic Control Specialist, GS–9. He commuted to his home on his days off and stayed in a motel while in Laramie. On February 5, 1970, he was returned to the Denver FSS and on April 12, 1970, he was reassigned to Trinidad, Colorado.

On August 26, 1971, the defendant's Department of Civil Rights ruled:

> The complainant was treated differently from other employees similarly situated. The record does not show a reason for the different treatment except that the complainant was a Negro and all others with one exception were not. The exception was an employee who was a Negro and was reinstated to a position of GS–2152–8 after court action.... [The Chief, Air Traffic Branch] when asked about the number of Negro air traffic controllers in the Denver Area professed not to know although one of the two was the complainant and the other was the subject of court actions. The area personnel representative made a similar reply to the same inquiry. The Chief again when asked about the aborted demotion and reassignment in September, 1967, claimed the reassignment was for training although a review of the records shows no employee reassigned to flight service training at a grade higher than GS–8. Again, when Mr. Harbison was advised of the reasons for his non-selection for promotion to GS–11, the selecting officer stated experience at a lower level flight service station was necessary. A review of the promotion file shows the selecting officer did not use such experience as his reason for selections.

> he was not treated as other employees were between October 1967 and July 1968 affected the action to promote employees to GS–11 at the Denver Flight Service Station in May, 1969. Because of the discriminatory actions, it cannot be shown that the complainant's qualifications for promotion were in any way inferior to those of every other candidate selected for promotion.

The decision was that:

> The FAA is directed to take action to place Mr. Harbison in a position comparable to the one he would have occupied absent the acts of discrimination and advise this office within 30 days of the action or actions that have been taken.

When the plaintiff was transferred to Trinidad, he was informed that there was no place for him in Denver, and there was a need for him in Trinidad. However, at Trinidad, he found that he was surplus, and when retransferred to Denver as a result of the favorable decision, his job has never been refilled to this date. While at the Trinidad station, on December 1, 1970, he completed a course on the fundamentals of supervision with a final grade of 96 out of 100. As a result of the August 26, 1971 decision, plaintiff was promoted on September 5, 1971 to Air Traffic Control Specialist, GS–11 at the Denver FSS. A review of his personnel file shows that he has been continuously above average in his work and diligence to this date despite the Chief of the Air Traffic Branch having said of him on July 5, 1968 in regard to his request for radar controller training:

> All of these factors indicate a lack of potential to become a controller. We strongly feel that you would not be suitable for a position in Air Traffic Control.

Plaintiff acted as Assistant Chief for over 500 hours on various shifts and, according to his personnel records performed the supervisory duties in a satisfactory manner. On March 23, 1973, he received a letter of commendation for "the outstand-

ing assistance you have, and continue to provide your fellow journeymen and supervisors, often setting examples followed by fellow employees. Regardless of your assigned position, you constantly monitor adjacent positions and are quick to assist anyone busier than yourself, not occasionally, but continuously." This award earned him one point under the merit promotion program, but had it been the award of "Quality Step Increase" originally recommended by his supervisor, he would have had two points. The Station Chief returned the recommendation without approving it and requested additional documentation, along with several other applications by other supervisors for awards for employees. At least two other supervisors provided additional documentation for their employees, and they achieved the higher award. A review of those awards does not reveal citation of performance substantially superior to that cited on behalf of the plaintiff.

In December, 1974, three Assistant Chief positions at the Denver FSS were advertised. Having placed his bid, the plaintiff, on December 20, 1974, directed his attorney to write Mervin M. Martin, Rocky Mountain Regional Director for the FAA, asking him to intervene to prevent the danger that the plaintiff would once more be passed over for promotion. As Regional Director, Martin was charged with carrying out the Equal Employment Opportunities Programs of the government, and so far as the Region was concerned, was the top official charged with this duty. The FAA Rocky Mountain Region EEO Affirmative Action Plans since 1973 have been issued under his name. Nothing in those programs deals with the specific problem of minorities being passed over for promotion or not being suitably recognized for promotion, nor has that question been addressed in regard to blacks, nor was there any affirmative action plan dealing with minority or black promotion in regard to air traffic controllers relating to any possible subjective elimination of such candidates for promotion. He was not aware of how many Assistant Chiefs in the Rocky Mountain Region are or are not black. Figures concerning the hiring of minorities were not broken down to distinguish blacks as a particular group.

Bidding for the three vacancies was closed on December 27, 1974, and by the time Martin replied on January 13, 1975, to the plea for intervention, the plaintiff had already been eliminated from the promotion panel by reason of the superior qualification of other bidders. Nevertheless, Martin replied:

> In my opinion, Mr. Harbison's concerns are premature since no selections have been made for any of the three assistant chief vacancies.

Martin had not troubled to check this out. Lindell E. Gilliam filled one of these Assistant Chief positions in April, 1975.

The plaintiff in his discrimination complaint and in his testimony claimed that in May, 1976, Gilliam told him that he should have had the job Gilliam now filled, explaining that an extensive recruiting effort on the part of Regional Office officials enticed him to submit his bid while Gilliam was Chief at the Laramie FSS, a level II facility. Plaintiff states that Gilliam told him that he was virtually assured that if he put in his bid, he would be selected, and that he had not known why there was so much interest from the Regional Office in this particular job to solicit his bid, until he came to the Denver FSS and found out the plaintiff's status. Gilliam mentioned in this conversation that he did not particularly want to come to a larger city, but because of the assurances he would get the GS–12 job if he bid on it, he went ahead and submitted his bid. Gilliam denied that this conversation had occurred, but admitted that there had been encouragement by Operation Specialists Clyde Powers and Norm Burkholtz. In August, 1976, he resigned his Denver position and accepted a position at a level II facility at Sheridan as Chief, a reduction in rank to GS–11. His wife has a masters in botony and is employed by the U.S. Forest Service in Sheridan. She was unemployed in Denver. His daughter dropped out of high school when

they moved to Denver. In 1972, he was Chief of the Eagle, Colorado FSS. In 1973, he became the Chief of the Laramie facility. He admitted that he preferred small communities, although not as small as Eagle. He left the Assistant Chief position in Denver on medical advice because of spasms in the neck muscles diagnosed as stress. He considered resigning the Denver position after only a year there. Plaintiff testified that he might not have gotten the position had Gilliam not applied, but circumstances indicate that management reaches out to find bidders whose qualifications are superior to his own for promotion. I find that the plaintiff's testimony is credible and more persuasive than that offered by the government. I reject Gilliam's denial.

Fifteen candidates were rated and ranked pursuant to the assistant chief announcement of August 5, 1976. Donald W. Brimner was the selecting official to whom four of the best-qualified of the fifteen were referred. During interviews he determined three of the four were no longer available due to having accepted other positions, leaving one name, Pakiz, on the panel. Five additional names were then referred to him. Plaintiff was not among any of the nine names referred to him and therefore, there was no opportunity to consider the plaintiff. On the rating spreadsheet, four candidates were listed best qualified, eight highly qualified, and three qualified. Plaintiff was ranked highly qualified, as was the ultimately successful candidate, Steven Dyke. Since nine names were ultimately submitted to Brimner, and three candidates, those only qualified were never in the running, plaintiff was only one of three candidates out of the fifteen ranked as highly qualified or better but who never made the promotion panel. However, Brimner testified that the plaintiff's personnel evaluation ratings (PER) were as good or better than anyone who had applied from the Denver FSS, including those of Steven Dyke.

Plaintiff's Exhibit 19 consists of the documents submitted by each candidate, with the exception of four which the defendant was not able to produce pursuant to discovery. Those four included two highly qualified candidates who had withdrawn from consideration and two candidates who were only qualified. Therefore, a meaningful analysis can be made from the remaining documents. Each candidate submitted his PER, Part II of which set forth the yearly evaluation of the employee's actual performance of major job assignments, rated on an ascending scale from "needs to improve," "meets requirements," "exceeds requirements" and "far exceeds requirements." Part IV of this form, 3430.1, further rates employees as to skills, knowledge and abilities, on an ascending scale from A through D. Section B of Part IV is used for candidates who are already supervisors, and rates them on the same scale A through D. Candidates who are not supervisors submit a separate form entitled, "Supplementary Experience Statement for a Supervisory Position," RM Form 3330–13, wherein their supervisor rates them as to "A. Poor Potential, B. Fair Potential, C. Good Potential, D. Excellent Potential." On this form, the supervisor is instructed to use "your judgment of the probability of the candidate's success in a supervisory position." On this form, plaintiff's supervisor, Gilliam, rated the plaintiff as having fair potential on two items, and good potential on five. On one item, Gillam felt Harbison showed excellent potential. The subjective nature of Form 3330–13 can be observed from the following:

a. Wayne J. Hall, an Assistant Chief who had known the plaintiff since 1968, and who had supervised the plaintiff 20% of the time since then, stated that if he had had the occasion to prepare a 3330–13 for the plaintiff, he would have rated the plaintiff as having excellent potential on "one or two items."

b. William Knight, the EEO counselor, who prepared the "Report of Investigation of the EEOC," Plaintiff's Exhibit 16, stated in Subexhibit 1 therein:

My review [reveals] that ... Mr. Harbison's performance ratings ... were, in

my opinion, better than the performance ratings of most of the other candidates rated highly qualified.

c. Brimner testified that Form 3330–13 provides an opportunity for rating supervisors to effect subjectively the ranking of candidates for promotion to supervisory positions. He admitted that there was a "walking on water" principle known to exist in the agency, wherein the rating supervisor rates a promotional candidate high on this form so that he will be competitive on the promotion panel, while another rating supervisor, such as himself, might rate the candidate fairly, placing his own candidate at a disadvantage.

d. The plaintiff's witness, Benham Ignacio, who has been a rating supervisor since 1970 in the RMN FAA and who was in the ranking committee within the FAA in 1974 through 1978 called the same principle a "Jesus Christ" rating. He testified that he tended to rate employees from his department highly so that they would be competitive.

e. Candidates already supervisors receive, as stated before, no ratings on 3330–13, but rather on Part IV, Section B. Candidate Vincamp, a non-supervisor, was accidently rated on this form by his supervisor, Robert P. Nowak. In five items he was rated in Column B (Fair) and on three items, he was rated in Column C (Good). However, this was corrected, and a Form 3330–13 was submitted, with Melvin H. Hoover rating him. On this, he was rated on six items as having "good potential" and on two items as having "excellent potential."

f. It is obvious on its face that Form 3330–13, since it predicts the future, is not objective; it is conjectural.

Benham Ignacio, the plaintiff's witness referred to above, testified without contradiction that there are three basic means by which the merit promotion program may be manipulated by supervisors to affect the employee's ranking on promotion panels:

a. An employee may be pre-qualified non-competitively by placing him in jobs not requiring promotion that will give him points for diversity.

b. An employee may be assigned to projects for which he can be rewarded which will earn him points, and

c. The supervisor may inflate the PERs and the supplemental evaluation 3330–13 executed at the time of the application for promotion.

Ignacio also testified that he had reviewed the documents in Plaintiff's Exhibit 19 and broken it down in a manner in which the qualifications on an objective basis were placed on the left-hand side of the graph and the subjective calculations on the right-hand side. This was Plaintiff's Exhibit 36. This exhibit demonstrates that when ranked on the basis of experience, the plaintiff tied for second. When rated on the basis of his yearly performance records, he ranked third. When rated for education, he ranked fourth. It is clear that the plaintiff would have attained the promotion panel had these standards alone been involved. However, in regard to awards, he ranked seventh, and in regard to the supplementary evaluation, embodied in 3330–13, he ranked tenth. The result was that on his total rankings, he ranked tenth. Since a total of nine candidates were referred to the panel, he was eliminated. It is noteworthy the merit promotion program provides:

> If the points are distributed in such a manner that meaningful distinctions cannot be made, a maximum of ten candidates MAY be referred if their total point score is within ten points of the point score of the candidate ranked in fifth place. (Emphasis in original.)

After the filing of suit, plaintiff again applied for promotion to Assistant Chief announced on February 1, 1978. There were two vacancies with 23 candidates, the plaintiff being the only black. He again failed to make the promotion panel. On this occasion, his supervisor, Nowak, rated him as having good potential on all items on Form 3330–13. A review of the worksheets which include the PERs and Form 3330–13s for each candidate establishes the

plaintiff's position that there is a wide discrepancy between the objective and subjective ratings of candidates. Without encumbering the record with a total review of these documents, a few illustrations will suffice. Candidate Currigan was ranked 100% of the time as exceeding requirements on evaluations of his past performance but as to the prediction of how he would fill the job of supervisor, he was rated 100% far exceeding requirements. Candidate Burley was rated on his past performance as 50% meeting requirements, 50% exceeding requirements, but on his rating on Form 3330–13, 100% far exceeds. Candidate Shakleford on his major job assignments was rated 20% far exceeds, on his skills, knowledge and abilities, 30% far exceeds, but on his Form 3330–13, 87.5% far exceeds. Candidate Wimber was never rated as far exceeding requirements on his past performance, but the prediction of his future performance for supervisor was 62.5% far exceeding requirements. Candidate Johnson never far exceeded requirements on past performance, but far exceeded requirements in evaluating his future 25%.

Martin admitted that the Department of Transportation is second only to the Department of Agriculture among the federal agencies in having the poorest record in the hiring and promotions of minorities, including blacks. According to the Work Force Profile for the Rocky Mountain Region of September 30, 1976, 1.31% of all employees in the Rocky Mountain Region were black. As of that time, 610 of the employees were GS–13 through GS–17, but none of them were black. 1.1% of the 813 GS–12s were black, and 1.97% of the GS–11s were black. Of the GS–10s, none were black. As of the time of the investigation of the plaintiff's discrimination complaint, there were 206 air traffic control supervisors, none of whom were black. Of the air traffic control specialists, out of 1,428, there were 14 blacks, .98%. There has been a significant increase in minority employment since 1971, when only 3.4% of the total employment was minority whereas by September 30, 1976, 6.7% were minority.

During the period in question, black labor force in the Rocky Mountain Region broken down by state was as follows:

| State | Percentage of Blacks in Labor Force |
|---|---|
| Colorado | 2.7% |
| Montana | .28% |
| Utah | .5% |
| Wyoming | Unknown |
| North Dakota | .1% |
| South Dakota | .17% |

The regionwide competitive promotions extrapolating from Plaintiff's Exhibit 24 were as follows:

| Year | Non-Blacks | Blacks | % of Blacks | Total Competitions | Black Promotions | % of Black Promotions |
|---|---|---|---|---|---|---|
| 1975 (Jul-Dec) | 2,802 | 37 | 1.30% | 81 | 0 | 0% |
| 1976 | 2,873 | 39 | 1.33% | 183 | 3 | 1.6% |
| 1977 | 2,868 | 39 | 1.34% | 156 | 3 | 1.9% |
| 1978 (Jan-Jul) | 2,888 | 37 | 1.26% | 87 | 1 | 1.14% |

In the air traffic division, competitive promotions from 1975 through 1978 were as follows, as shown by Plaintiff's Exhibit 24:

| Year | Non-Blacks | Blacks | % of Blacks | Total Competitions | Black Promotions | % of Black Promotions |
|------|-----------|--------|-------------|--------------------|------------------|----------------------|
| 1975 (Jul-Dec) | 1,479 | 17 | 1.13% | 33 | 0 | 0% |
| 1976 | 1,486 | 16 | 1.06% | 92 | 1 | 1.08% |
| 1977 | 1,501 | 19 | 1.25% | 84 | 3 | 3.57% |
| 1978 (Jan-Jul) | 1,536 | 18 | 1.15% | 48 | 0 | 0% |

The Rocky Mountain Region Objectives and Action Items for 1978 and 1979, Plaintiff's Exhibit 30, states that the "work force as a whole lacks sufficient knowledge and understanding of the background, purpose and goals of the EEO program." It sets forth a number of affirmative actions. None of them deal with competitive promotion of blacks. It indicates substantial consideration of the hiring of minorities and women. It states that minorities appear to be under-represented in air traffic control, GS–2152 (5.76%). It states a goal of hiring 12 GS–2152 blacks by September, 1980.

Plaintiff's witness, William Dew, testified that when he was hired in 1963 as the Jackie Robinson of the Rocky Mountain Region of the FAA, he was shortly thereafter discharged when a youthful indiscretion was discovered. He was terminated for the "good of the service" and was at that time the only black air traffic controller in the FAA. He was reinstated only after a legal struggle which consumed six years and three months and awarded back pay. He since has become a GS–13 Air Traffic Controller at the Longmont Center, and his performance has been continuously exceeding or far exceeding requirements on major job assignments. Since 1970, a number of blacks have been recruited as trainees for air traffic controllers. At the time of trial, there were seven black air traffic controllers and one black trainee at the Longmont Center. In 1978, he became a member of the Civil Rights Committee within the Region and a member of the Minority Recruitment Task Force. He resigned the position after one year of service because he felt that these organizations paid only lip service to their an-

nounced goals in the recruitment of blacks. He personally recruited 15 blacks who took the examination for air traffic controller and none was hired. One of these was not hired because she was over-qualified as far as education was concerned. She had been an air traffic controller in the U.S. Air Force for four years, was recently discharged from the Air Force and had completed a college degree and was working on her masters. Pursuant to the Veterans Readjustment Act (VRA), she was under the impression that she could come into the FAA without further qualification than the entrance air traffic control examination, which she passed. She was informed that she could not qualify under the VRA because anyone having more than 14 years of education could not come into the FAA under that act. This meant that she had to come into the agency under the Civil Service Competitive Register, but because there was no additional hiring from the Civil Service Registration Roster at that time, by the time that hiring would open again, she would have been over the age limit of 31.

Another black that Dew recruited failed to be able to make an appointment with the Regional Personnel Officer after attempting several times to do so.

The foregoing facts amply demonstrate a pattern and practice of discrimination against blacks in the Rocky Mountain Region of the FAA and in the Denver Flight Service Station in regard to competitive promotions among air traffic controllers. The defendant in the Rocky Mountain Region has failed to inaugurate to date any affirmative action or objective relating to the elimination of discrimination against

blacks in regard to competitive promotions, despite the fact that the plaintiff and William Dew have served as gadflies since 1963 to sting the Agency's alertness to the problem, and despite the clear directives of the 1974 Presidential Executive Order 11246 calling for the hiring and promotion of minorities within the government service. The EEO program requires supervisors and managers to take affirmative action in considering minorities for career development towards positions of increased responsibility. "Affirmative action" implies selecting minorities out of a group of well qualified individuals for positions of increased responsibility. As has been stated in an FAA management newsletter: "It is human nature to stick with the familiar—continually select from the ranks of those persons whose attitudes and morals we are most acquainted with; ... the really good manager reaches out in an affirmative way to find out other untapped resources of ... supervisory potential." As was stated in the August 26, 1971 department decision regarding the failure to promote the plaintiff in May, 1969, the plaintiff was treated differently from other employees similarly situated with no reason for the different treatment except that the complainant is black and all others involved are not. This continues to be true. The plaintiff has continuously been an exemplary employee whose work has been described by his supervisor, Gilliam, as follows:

Mr. Harbison is an extremely effective and capable specialist. His knowledge of his own option and related technical areas make it possible for him to consistently produce quality work. He is an excellent team worker and has demonstrated on numerous occasions his willingness to assist other positions when the need arises.

Preflight: Mr. Harbison has exceeded requirements at this assignment by grasping weather conditions quickly, providing briefings that are clear, concise, and very thorough. Mr. Harbison received a letter of appreciation for his work at this position during this rating period.

Flight data: He has exceeded requirements at this position by his very conscientious attitude toward his assignment. He has repeatedly shown superior effort and ability in completing search procedures for unreported or overdue aircraft. Recently, on many occasions, I have noted his work at this position has been continuously complete, timely, and based on sound judgment of the situation, requiring little, if any, follow up by his supervisor.

In-flight: Mr. Harbison has exceeded the requirements of this position by showing a superior effort and attitude toward his job. He has repeatedly displayed extra effort and ability in providing in-flight services and assistance.

What is convincingly clear beyond any reasonable refutation is that because of his race, the plaintiff's application was not given the full and fair consideration it warranted. *See Gillin v. Federal Paper Board Co.*, 479 F.2d 97 (2 Cir.1973). What is equally clear is that this plaintiff has suffered greatly from a callous and brutal disregard of his ability and his humanity. By a preponderance of the evidence, the plaintiff was the most qualified of all applicants and his failure to be selected was the result of an impermissible selection process which permitted the systematic exclusion of blacks from promotion. Indeed, the plaintiff's race was the only factor capable of proof which adversely affected his promotion. While no one fact standing alone manifested the degree of racial discrimination which virtually permeates the promotional processes involved, all the facts and circumstances taken together admit but one conclusion and that is that blacks, however well qualified, will not be given full and fair consideration when applying for supervisory positions in this agency unless compelled so to do by court order.

Considering all of the evidence there is no doubt in my mind that Earl B. Harbison was refused advancement to Assistant Chief GS–12 on the date Steven Dyke was promoted to that position for no reason other than discrimination on account of his

race and color, in violation of 42 U.S.C. § 2000e–3(a). *But for this racial discrimination, the plaintiff would have been promoted to that position and rank as of that date.*

On the basis of the foregoing, I conclude and order as follows:

1. Defendant shall immediately promote plaintiff to the position and rank of Assistant Chief GS–12 as of the 1976 promotion date of Steven Dyke to that position. Defendant shall award plaintiff all time in-grade and step increases from that date to the date of this order effective with the date that each such increase should have been and shall apply any merit increases which plaintiff may have received in the interim so that, in the final analysis, the plaintiff will receive all back pay and other benefits which he would have received had the promotion been timely made on the 1976 date.

2. The defendant shall pay plaintiff his reasonable attorney's fees and costs herein expended. The parties have stipulated that as of January 25, 1980 the plaintiff's attorney's fees were of the value of $14,358.75, and that amount is hereby awarded for attorney's fees as of that date. The defendant shall also pay plaintiff's attorney his reasonable attorney's fees and costs expended subsequent to that date.

3. On or before November 30, 1983, the parties shall submit to the court the amounts necessary to reduce the foregoing orders to specific figures. If the parties are unable to agree on any of these figures, including the amount for reasonable attorney's fees, they shall notify the court and the matter will be set for hearing on an expedited basis. The Clerk of the Court shall not enter judgment until such time as the foregoing amounts are determined.