Nancy A. GILLIN, Plaintiff-
Appellant,

v.

**FEDERAL PAPER BOARD COMPANY, INC., Defendant-Appellee.**

No. 575, Docket 72–1907.

United States Court of Appeals,
Second Circuit.

Argued March 16, 1973.

Decided May 11, 1973.

Lewis M. Steel, New York City (Gretchen White Oberman, New York City, of counsel), for plaintiff-appellant.

Donald F. Keefe, New Haven, Conn. (Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., of counsel), for defendant-appellee.

Susan J. Johnson, Washington, D. C. (William A. Carey, General Counsel, Julia P. Cooper, Associate General Counsel, Beatrice Rosenberg and David W. Zugschwerdt, Attys., Washington, D. C., of counsel), for United States Equal Employment Opportunity Commission, amicus curiae.

Before HAYS, MULLIGAN and OAKES, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a judgment entered on May 30, 1972 in the United States District Court for the District of Connecticut, dismissing damage claims for sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1970),[1] after a nonjury trial on January 5, 1972 before the Hon. M. Joseph Blumenfeld, *Chief Judge.* On May 26, 1972, the court filed a memorandum decision containing its findings of fact and conclusions of law. Appellant Nancy Gillin (Gillin) contends that the district court erred in rejecting her claims that her former employer, Federal Paper Board Co., Inc. (Federal), denied her a promotion and a salary commensurate with her duties because of her sex and retaliated against her when she filed discrimination charges with the United States Equal Employment Opportunity Commission (EEOC).[2] Affirmed in part, reversed in part and remanded.

Federal operates paper mills and carton plants in Connecticut and elsewhere in the United States. In 1961 it established a New England Transportation Department which was a freight hauling operation for both raw materials and finished products. A number of trucks were leased and a terminal established in New Haven, Connecticut. During the same year, appellant, who had been an employee of Federal in New Haven since 1957, was appointed administrative assistant to the traffic manager, Mr. Aaron Denenberg. Her new duties included responsibility for the accounting functions of the Department, personnel and payroll records and the purchasing of office supplies. When Denenberg was away, Gillin was in charge of the daily office operation. In April, 1962, Denen-

1. Title VII of the Civil Rights Act of 1964 was recently amended by the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 103.

2. The EEOC conducted two investigations into Gillin's charges. The first did not disclose any impropriety in Federal's ac-

tions. After the second, however, the EEOC rendered a decision that "[r]easonable cause exists to believe that [Federal] violated sec. 703(a)(1) and sec. 704(a) of the Civil Rights Act of 1964 as alleged." EEOC conciliation efforts failed and this suit was commenced.

berg resigned after having expanded the Department by leasing additional trucks which were operated from a terminal in Sprague, Connecticut. Thereafter, the New England transportation operation was placed under the jurisdiction of a vice-president, Mr. Hesser, who was general traffic manager for the mills in the Western Division. Eventually in 1965 Mr. Varsho was appointed traffic manager of the New England Division trucking and freight operations.

On March 15, 1966 Varsho informed Gillin that he was being promoted to the position of general traffic manager. She indicated her interest in the job he was vacating but was advised by Varsho that it "was more suited to a man" and "wasn't suitable for a woman." Gillin countered by calling his attention to the Civil Rights Act of 1964 and on March 24, 1966, she filed her complaint with the EEOC alleging sex discrimination since she had not been considered for the traffic manager's position.[3]

## I

As a result of her charges, the EEOC conducted investigations and compiled a 260 page investigative report.[4] Prior to trial the parties requested the district court to rule on the admissibility of this report as a business record under 28 U.S.C. § 1732. On February 15, 1970, Hon. Robert C. Zampano filed his opinion:

> [The investigative report] is a mishmash of self-serving and hearsay statements and records which contain conflicting opinions, comments and inferences drawn by investigators, potential witnesses, and unidentified persons. This maze of material would

thwart rather than ease the trier's efforts. Credibility of the witnesses will play a major role in resolving the conflicting positions of the parties here; justice requires that the testimony of the witnesses be given in open court, under oath, and subject to cross-examination. On the record before this Court the tests of need, reliability, and trustworthiness have not been met and, therefore, [the report] as a unit is not admissible as a business record under 28 U.S.C. § 1732.

52 F.R.D. 383, 385.

His decision, however, did not preclude the appellant from introducing any portion of the document which might be found admissible on other grounds. See 52 F.R.D. at 384. Judge Blumenfeld adhered to these guidelines at trial.

■ On appeal it is urged that the failure to admit the EEOC investigative report constituted error. Appellant's only authority for finding the document admissible is Smith v. Universal Serv., Inc., 454 F.2d 154 (5th Cir. 1972), which is clearly distinguishable. In that case the court held admissible as a business record under 28 U.S.C. § 1732, not the lengthy investigatory report sought to be introduced here, but rather the decision of the EEOC containing a summary of the investigation. The EEOC decision in that case takes up little more than a page of the court's opinion in which it is set forth. See 454 F.2d at 158–160. A comparable document was ruled admissible by Judge Zampano in this case (52 F.R.D. at 384–385) and was received into evidence as a plaintiff's exhibit. Moreover, the investigator who compiled that portion of the in-

3. Gillin amended her complaint on May 23, 1966 and again on July 26, 1966 adding the further charges that Federal, in retaliation for the filing of the original complaint, demoted and ultimately fired her.

4. The report in question contains the material gathered in both EEOC investigations:
 (a) pages 8–15, the field report of investigator Ring who concluded that vio-

lations occurred, (b) pages 16–176, the underlying material accumulated by Mr. Ring to support his conclusion, (c) pages 177–188, the field report of investigator Holt who found that no violations existed, and (d) pages 189–260, the underlying material compiled by investigator Holt to support his determination.
Gillin v. Federal Paper Board Co., 52 F.R.D. 383, 385 (D.Conn.1970).

vestigative report favorable to the appellant, was permitted to testify from it on trial and there is no showing of any prejudice from the report's exclusion. Under these circumstances we find no reason at all to disturb the district court's judgment on this ground. See Cox v. Babcock & Wilcox Co., 471 F.2d 13, 15 (4th Cir. 1972); Heard v. Mueller Co., 464 F.2d 190, 194 (6th Cir. 1972).

## II

■ Appellant claims that she was discriminated against because she was denied a salary commensurate with her duties.[5] We believe that the finding of the trial court that this position is "wholly unsupported" is correct. There is no evidence of sex bias with respect to wages. Mr. Varsho, her supervisor, who refused to consider her for promotion (see III infra), in fact recommended in October, 1965 that she be given a $600 raise, praising her efficiency and pointing out that she was receiving less than some of her subordinates. While even after receiving the raise, she was earning slightly less than one male dispatcher she was supervising ($128.65 per week as compared with $136.90 per week), there is no proof that her occasional supervisory responsibility properly merited a higher salary than that of a subordinate whose skills might well command more in the job market. It is not at all unusual that those who direct or supervise, are paid less than those whose particular job skills or experience may be worth more to the employer. It should also be noted that Gillin was entitled to overtime while dispatchers were not. Suffice it to say that the record here is barren of proof either that her salary was incommensurate with her duties or that if this was the case that the disparity was due to her sex. See Ammons v. Zia Co., 448 F.2d 117, 119–120 (10th Cir. 1971); cf. Arkansas Educ. Ass'n v. Board of Educ., 446 F.2d 763, 770 (8th Cir. 1971).

■ Appellant's claim that her employer retaliated against her for filing charges with the EEOC by demoting her and ultimately discharging her,[6] was rejected by the district court and properly so in our view. The facts upon which appellant rests her claim of retaliatory demotion are that prior to 1966 she had neither punched a time clock nor been paid for overtime hours, and that in May of 1966, subsequent to the filing of her discrimination charges, she was directed to begin punching the clock and not to work overtime hours without permission. This resulted in a reduction of her hourly work week and a commensurate reduction was made in her work load, but her weekly salary remained unchanged.

If this is to be characterized as a demotion, it is clear that the change was not precipitated by the EEOC complaint, but rather by a determination of the

5. 42 U.S.C. § 2000e–2(a) (1970) provides:
It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

6. 42 U.S.C. § 2000e–3(a) (1970) provides:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Wage and Hour Division of the United States Department of Labor in January 1966 that Gillin was a non-exempt employee and thus entitled to overtime wages. While it did take Federal several months to act on the Department's findings, there was testimony that Gillin's employment status was altered in accordance with usual company procedures and Gillen testified that the company's only alternative to putting her on restricted hours was to give her a promotion.

The evidence concerning Gillin's termination of employment at Federal is in conflict. The only thing that is undisputed is that she was fired in July, 1966. Mr. George Sweezey, her supervisor at that time, testified regarding several instances where Gillin was uncooperative and was the source of continuing dissension in the office. He further stated that after a discussion with her in which he tried to straighten things out, she informed him that she had been advised by her lawyers and that it would be helpful to her discrimination case if she could get fired. He then made out a "blue slip" stating "uncooperative" as the reason for discharge. Gillin denied this, taking the largely unsupported position that her employment was terminated in retaliation for her claim of discrimination against Federal.

It is clear from Judge Blumenfeld's opinion that he chose to credit Sweezey's recollection of events. He heard the testimony of both Gillin and Sweezey and had an opportunity to observe their demeanor and assess their credibility. We have no basis to say that his assessment was wrong.

### III

■■ Appellant urges further that Federal's refusal to consider her for promotion to the position of New England Traffic Manager constituted employment discrimination on the basis of sex.[7] We are fully in accord with the finding below that Sweezey who ulti-

mately was awarded the position, was clearly better qualified for the job than Gillin. We see no point in detailing his background which is set forth in the opinion below. In any event, appellant does not seriously dispute that Sweezey was the superior applicant. The suggestion that he was overqualified and that the job requirements ultimately enumerated were determined subsequent to Gillin's EEOC complaint, does not at all justify the position that the qualifications were artificially augmented in order to eliminate Gillin. The position to be filled carried substantially greater responsibilities and demanded commensurably higher qualifications than those required of predecessor incumbents. The requirements were clearly job related and there is no proof at all of artificial inflation except for the *post hoc ergo propter hoc* thesis of appellant. We have no quarrel either with the finding below that Gillin was not qualified. While Gillin was in charge of the traffic operation when her superiors were absent, her experience was primarily administrative and clerical and not operational. Her intermittent supervisory responsibility did not preclude Federal from selecting an obviously superior applicant to assume the permanent and expanding job responsibility which the employer envisioned. But it does not follow that although the company violated no law in hiring Sweezey, it was not guilty of sex discrimination against Gillin.

Federal does not now and did not at any time seek to avail itself of the statutory defense that sex was "a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . ." 42 U.S.C. § 2000e–2(e)(1) (1970). Therefore Gillin was entitled to be treated as any other applicant for the position without any regard whatever to sex. She was not given equal treatment and the record establishes that Federal's refusal to consider her for the position

---

7. See note 5 supra.

was not due simply to her lack of qualification but her sex as well.

While the evidence reveals that Mr. Kennedy, Federal's Vice-President, Secretary and General Counsel, had the ultimate responsibility for filling the job in question, Varsho had the task of making recommendations. He did not recommend Gillin, and Kennedy only interviewed the one applicant, Sweezey, who was hired. In fact, Varsho testified that he "didn't consider her for the job." Varsho's role here was crucial and his testimony indicates that although he did not believe Gillin to be qualified for the post, in deciding not to consider her, he was unquestionably also motivated by the fact that she was a female. See Robinson v. Lorillard Corp., 444 F.2d 791, 797 (4th Cir. 1971), petition for cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) and 404 U.S. 1007, 92 S.Ct. 651, 30 L.Ed.2d 655 (1972).

He advised Gillin when she expressed her interest in the position that it was not suited to a woman and was more suitable to a man. He indicated to the EEOC investigator that he would have placed the job newspaper advertisement in a column specifically directed to males, had such been available. On trial while he conceded that a woman might handle the job under special circumstances, he adhered to the view that the traffic manager's position was a "man's" post. He stated that "[i]t would be an extreme case that a woman could ever take on a truck fleet operation and do it properly." He further testified:

Q. So you are satisfied that Miss Gillin's femininity hurt her and also her qualifications weren't there, right?

A. Correct.

Q. All right. And that had her qualifications been there her femininity still would have hurt her?

A. Yes, it might have.

Whether or not Varsho's position be characterized as Victorian or male chauvinism is not germane. See Weeks v. Southern Bell Tel. & Tel. Co., 408 F.2d 228, 236 (5th Cir. 1969). The fact is that she was not treated on an equal footing with male applicants. In fact two of her male subordinates were given the interview by Varsho which was denied Gillin.

Equality of footing is established only if employees otherwise entitled to the position, whether male or female, are excluded *only* upon a showing of individual incapacity.

Rosenfeld v. Southern Pacific Co., 444 F.2d 1219, 1225 (9th Cir. 1971) (emphasis added).

While the ultimate prize was won by the male who had superior qualifications, this in our view does not purge Federal of its prior discriminatory act of refusing to consider her at all not *solely* because of lack of qualification but because she was a woman. While Gillin did not have all of the qualifications for the position, she fell clearly within the group entitled to initial consideration especially in a company which purported to have a policy of promoting from within. Having had some familiarity with and experience in most if not all the facets of the position, the refusal of Varsho to consider her because she was a woman, is clearly a mischief which the statute was designed to prevent. We hold therefore that the court below was in error in not considering this point and in assuming that Sweezey's superior qualifications presumably cured the previous act of discrimination. In sum we find no wrong in hiring Sweezey instead of Gillin but we hold that Federal did transgress by failing to consider Gillin not simply because she was not qualified but also because she was a woman.

We find it necessary to remand to the district court because we have no basis at all on the record before us, to determine what damages, if any, should be awarded to the appellant. The complaint here makes no special request for equitable relief and in view of our discussion of the law there is no justification for any injunctive remedy. How-

ever the plaintiff has sought damages in the sum of $250,000 without any allocation among the various statutory violations alleged. The court below had no occasion to reach the damage question finding no liability. The issue was not argued or briefed in this court. While it is difficult to determine the basis for compensatory damages here (see King v. Laborers Local 818, 443 F.2d 273, 278–279 (6th Cir. 1971); Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1259–69 (1971)), we think that appellant should be afforded the opportunity to establish her theory of damages in the trial court.