**Musset THERMIDOR, Plaintiff,**

v.

**BETH ISRAEL MEDICAL CENTER, Defendant.**

**No. 86 CIV. 0152 (PKL).**

United States District Court, S.D. New York.

April 8, 1988.

---

Dienst & Cahn, New York City (Alan Serrins, of counsel), for plaintiff.

Seyfarth, Shaw, Fairweather & Geraldson, New York City (Reginald E. Jones,

Mitchell H. Rubinstein, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge:

Plaintiff Musset Thermidor ("Thermidor") brings this action pursuant to sections 703 and 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2, 2000e–3. Thermidor claims that he was discharged from his position at Beth Israel Medical Center ("Beth Israel") on the basis of his race color, nationality and age and in retaliation for filing complaints with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC"). Beth Israel's motion for summary judgment is now before this Court. For the reasons set forth below, the motion is granted.

## FACTUAL BACKGROUND

Thermidor, a black male, was hired by Beth Israel as an accountant on August 26, 1969. On July 1, 1975, he was promoted from accountant to Assistant Manager of General Accounting. On June 15, 1976, he was promoted to Manager of General Accounting; on December 1, 1979, he was promoted to Assistant Director of General Accounting; on December 18, 1981, he was promoted to Director of General Accounting. Each of these promotions was recommended by Najmuddin Pervez ("Pervez") who was at all times from 1974 until August of 1982, Thermidor's direct supervisor.

Following a series of incidents with Pervez, Thermidor was transferred from his position as Director of General Accounting to the position of Director of Management Analysis in the Internal Audit and Systems Department ("Auditing"). This transfer was accomplished with no loss of salary, benefits, or seniority to plaintiff. The transfer was made at the insistence of Pervez, who claimed that he could no longer work with Thermidor. Pervez also maintains that he had received numerous complaints from staff members within and outside the General Accounting Department regarding their difficulties in working with plaintiff.

Upon his transfer to Auditing, plaintiff retained the title of Director. Notably, this position was created within the department specifically to accommodate Thermidor. Consequently, the position was eliminated upon Thermidor's termination. During his tenure in Auditing, Thermidor's supervisor was Martin Bieber ("Bieber"). Bieber was responsible for assigning auditing work to Thermidor and evaluating his job performance. As a Director, however, Thermidor was not subject to annual written evaluations, as were most lower level employees.

Bieber expressed misgivings about having Thermidor in his department, but felt that he had no choice as to whether he came to the Auditing department. Bieber Dep., at 11. Bieber specifically doubted Thermidor's ability to keep confidential information to himself, and this troubled him:

We had frequent conversations where I was told by Mr. Thermidor what different people were being compensated at, what benefits that he had and essentially that he'd essentially be using information that had come to his attention in a business capacity and he was using them in a conversation with me on a personal basis, which I had access on the same information. I frown upon that type of thing, and given the fact that my department is an audit department and we go into a number of confidential situations and we look into affairs of departments and we ourselves have had situations where we got involved in cases that ended up in litigation, I had a question of the integrity of an individual that comes across in a business capacity outside of the business realm.

*Id.* at 11–12.

In a memorandum dated Febraury 17, 1983, to James Stark ("Stark"), Director for Human Resources, Bieber indicated that he had expressed to Thermidor some dissatisfaction with his work. Bieber Dep., Exhibit 20. The memorandum stated:

Musset indicated that he did not like my comparing his level of productivity with that of the entry level internal auditor on

my staff. My response was that he is a more experienced person, with a greater knowledge of the Medical Center, who is earning more than twice the salary of an entry level auditor, my expectations are for a better rate of productivity by him than an entry level auditor, not a lesser one.

*Id.* At his deposition, Bieber indicated that he believed at that time that Thermidor's productivity was not necessarily lower than that of a an entry level auditor, but lower than what he expected from Thermidor. *Id.* at 18–20.

In the spring of 1983, Bieber assigned Thermidor to conduct an audit of the housing companies, an area under the supervision of Pervez. When Bieber informed Pervez of Thermidor's assignment to that task, Pervez objected to Thermidor's involvement on the ground that he could not get along with Thermidor. Bieber then assigned someone other than Thermidor to conduct the audit. On May 23, 1983, Thermidor sent a memo to Bieber complaining that his removal from the housing audit constituted discrimination; he also alleged that he was harassed by Pervez in connection with his removal. Thermidor, in his May 23 memo, requested a meeting with Dr. Robert Newman, General Director of Beth Israel.

In response to the memo of May 23 and several verbal requests by Thermidor, a meeting was held on June 24, 1983, to discuss Thermidor's claims. The meeting was attended by Thermidor, Dr. Newman, Bieber and Stark. At that meeting, Thermidor asserted that he was not given responsibilities commensurate with his job title, and that better job assignments were given to other employees. A memo to file summarizing the meeting was prepared by Stark, with copies distributed to the plaintiff, Bieber and Dr. Newman. At the conclusion of the meeting, Dr. Newman stated that Thermidor could either accept his job duties or look elsewhere for employment. In response, Thermidor agreed that he would prefer to continue working in the Auditing Department rather than seek employment elsewhere. Thermidor Deposition, annexed thereto as Exhibit 10.

Until the time of the meeting, Thermidor's "turnaround times were slow" on the audits he performed, and his work was "borderline satisfactory." Bieber Dep., at 38. Although Bieber expressed his dissatisfaction to Thermidor in conversations with him, nothing was reduced to writing.

On or about August 8, 1983, Thermidor filed a discrimination complaint with the New York State Division of Human Rights alleging that he was discriminated against in his transfer to Auditing and in his work assignments within that department. This complaint was also filed with the EEOC.

At the end of 1983, Bieber was required to make a recommendation as to a salary increase for Thermidor. He determined that he could not recommend Thermidor for a raise, and at that time decided to terminate Thermidor's employment. Bieber's evaluation of Thermidor's performance resulted in the conclusion that his work remained "borderline satisfactory." Bieber noted that Thermidor's productivity was low for someone with his experience and high salary. *Id.* Bieber's evaluation also emphasized that Thermidor was unable to get along with fellow staff members in the Auditing Department. Among other things, staff members complained that Thermidor conducted lengthy meetings with non-departmental personnel behind closed doors. This practice made it extremely difficult for other auditors to accomplish their work, as files were maintained in Thermidor's office.

Bieber also cited examples of Thermidor's refusal to obey his superiors. For example, in November and December of 1983, Thermidor conducted an audit of the Cardiology Division of the Department of Medicine. Although plaintiff was informed by the Administrator of the Division that an automated system had replaced the manual system, Thermidor nonethless insisted upon conducting a manual system audit. Thus, Thermidor's analysis was useless to the hospital.

The formal notification of termination listed the reasons for termination as "unsatisfactory job performance including

your unacceptable productivity and attitude which have impacted negatively upon the effectiveness of the department." Thermidor Dep., annexed thereto as Exhibit 12. Upon his termination, plaintiff's position was eliminated.

The original complaint in this action stated seven causes of action, which were as follows: (1) against Beth Israel and the individual defendants Pervez, Martin Bieber and Thomas J. Hayes, also employees of Beth Israel (collectively, the "individual defendants"), for violation of Title VII in their treatment of Thermidor; (2) against Pervez for intentional infliction of emotional distress; (3) against Beth Israel and the individual defendants for terminating Thermidor's employment; (4) against Beth Israel and the individual defendants for violation of Title VII in transferring Thermidor to Auditing; (5) against Beth Israel and the individual defendants for violation of 42 U.S.C. section 1981 for transferring Thermidor to Auditing; (6) against Beth Israel and the individual defendants for violation of Title VII in transferring Thermidor to Auditing in retaliation for complaints to defendants; and (7) against Beth Israel and the individual defendants for retaliation in terminating Thermidor's employment.

By stipulation entered into by the parties and so ordered by the Court on June 5, 1987, the parties agreed that the causes of action asserted against the individual defendants, the causes of action relating to plaintiff's transfer to the Auditing Department, and the cause of action for intentional infliction of emotional distress would be withdrawn with prejudice. As a result of the stipulation, only two causes of action remain. The first cause of action alleges that Beth Israel terminated Thermidor's employment because of his race in violation of section 2000e–2(a) of Title VII of the Civil Rights Act of 1964; the second alleges that Beth Israel terminated Thermidor's employment in violation of section 2000e–3(a) of Title VII of the Civl Rights Act of 1964 in retaliation for Thermidor's filing complaints with the New York State Division of Human Rights.

## DISCUSSION

The threshold inquiry confronting this Court is whether summary judgment is appropriate in a case primarily concerning factual issues of intent. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Plaintiff contends that "[w]here an issue primarily depends upon the Defendant's state of mind as it does in the case at bar, it is inappropriate for determination at the summary judgment stage." Memorandum of Law in Opposition to Defendant Beth Israel Medical Center's Motion for Summary Judgment at 3 (citing *Haas v. United States*, 492 F.Supp. 755, 760 (D.Mass.1980)).

In *Meiri v. Dacon*, 759 F.2d 989 (2d Cir.), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), Judge Kaufman, joined by Judges Oakes and Meskill, concluded that the granting of summary judgment is appropriate in Title VII cases despite the necessity for evaluating a party's intent.

In so concluding we are of course mindful that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated. *See Patrick [v. LeFevre], supra,* 745 F.2d [153] at 159 [2nd Cir.1984]. The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial cases or other areas of litigation.

*Meiri,* 759 F.2d at 998.

The Supreme Court recently provided significant guidance to lower courts in a trilogy of cases applying summary judgment in various contexts. *See Celotex Corp. v. Catrett,* 477 U.S. 318, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1985). As the Supreme Court observed, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which were designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 106 S.Ct. at 2555 (quoting Fed.R.Civ. P. 1) (citation omitted). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. at 2509–11; *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985)).

The Court must first look to the substantive law governing the case to determine which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 106 S.Ct. at 2510. Once the court has determined what facts are material, it must then determine whether there is a genuine issue as to a material fact. At this stage "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 2511. The standard for summary judgment thus "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex, supra*, 106 S.Ct. at 2553. *See Meiri*, 759 F.2d at 997 (quoting *Patrick v. LeFevre*, 745 F.2d at 161)). The burden on the moving party will be "discharged by 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the nonmoving party's case." *Anderson, supra*, 106 S.Ct. at 2511. For example, in *Matsushita, supra*, 475 U.S. 574, 106 S.Ct. at 1348, the Supreme Court considered whether summary judgment should be granted to a party accused of conspiring to artificially fix and maintain prices. The Court concluded that the party had discharged its duty to demonstrate the absence of a genuine issue of material fact by showing that it had "no rational economic motive to conspire" and that its conduct was "consistent with other, equally plausable explanations." 475 U.S. at 596– 97, 106 S.Ct. at 1361. Once a moving party has made a showing sufficient to discharge its duty, the onus then shifts to the nonmoving party to demonstrate that there is a genuine issue of fact for trial. *Id.* Thus, if Beth Israel can prove the absence of evidence to support Thermidor's case, the burden will shift to Thermidor to show that there is a genuine issue of fact for trial.

Section 703 of the Civil Rights Act of 1964, provides:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e-2(a).

The controlling legal standard for determining wrongful termination in Title VII cases is well established. In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 458, 252–53, 101 S.Ct. 1089, 1093– 94, 67 L.Ed.2d 207 (1981), the Supreme

Court delineated the standard applicable to discriminatory treatment cases. The Second Circuit has held that this standard specifically applies to all cases involving wrongful termination. *Meiri*, 759 F.2d at 995.

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).

*I. Prima Facie Case*

█ In order to establish a prima facie case of discrimination, a plaintiff must show: (i) that he belonged to a protected class, (ii) that his job performance was satisfactory, (iii) that he was discharged, and (iv) that, after he was discharged, the position remained open and the employer sought applicants with qualifications similar to those of the plaintiff. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. *See Meiri*, 759 F.2d at 995.

█ In the case at bar, it is undisputed that Thermidor belongs to a protected class and that he was discharged. Thus, the first and third elements of the prima facie case are clearly satisfied. As for the second requirement, it is not at all clear that Thermidor's job performance was satisfactory. However, Thermidor has stated that his work was satisfactory. Thermidor Dep., at 161. Drawing all inferences from the underlying facts in favor of the non-moving party, *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Matsushita, supra*, 475 U.S. at 587, 106 S.Ct. at 1356;

*Patrick v. Lefevre*, 745 F.2d 153, 161 (2d Cir.1984), the proof adduced is sufficient at the summary judgment stage to establish a prima facie case on this point.

The fourth requirement, that the employer has sought a replacement for plaintiff, is clearly not met in this case. However, the Second Circuit noted in *Meiri* that "the fact that the position was ultimately eliminated is of little relevance and should not sound a death knell to [a] Title VII claim." *Meiri*, 759 F.2d at 996. The Court went on to note that "[t]he elements of proof in employment discrimination cases were not intended to be 'rigid, mechanized or ritualistic.'" *Id.* (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Rather, the *McDonnell Douglas* test is merely a "sensible, orderly way to evaluate evidence as it bears on the critical question of discrimination." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed. 2d 403 (1983). Indeed, the Court cautioned in *McDonnell Douglas*, "[t]he facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977), the Supreme Court reiterated "the importance of *McDonnell Douglas* lies not in its specification of the discrete elements of proof required, but in its recognition of the general principle that any Title VII plaintiff must carry the burden" of creating an inference of discrimination. *Id.* at 358, 97 S.Ct. at 1866. *See Furnco*, 438 U.S. 567, 575–76, 98 S.Ct. 2943, 2949.

In light of this precedent, courts have concluded that "it is not necessary for a plaintiff, in each and every discharge case, to establish replacement efforts in order to make out a *prima facie* case" *Wooten v. New York Telephone Co.*, 485 F.Supp. 748, 760 (S.D.N.Y.1980). The issue of failing to replace a plaintiff's position upon discharge

has arisen with greatest frequency in age discrimination cases. The majority of circuits have held that failure to replace an older employee or replacement by an older employee will not foreclose prima facie proof as long as other direct or circumstantial evidence supports an inference of discrimination. *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 920–21 (2d Cir.1981); *Douglas v. Anderson*, 656 F.2d 528, 533 (9th Cir.1981); *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 96 (7th Cir.1985); *Smith v. University of North Carolina*, 632 F.2d 316, 335 (4th Cir.1980); *Bonham v. Dresser Industries, Inc.*, 569 F.2d 187, 195 (3d Cir.1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1018–19 (1st Cir.1979).

In *Stanojev v. Ebasco Services, Inc., supra*, the Second Circuit observed that the failure to prove that a replacement was sought following discharge or that a position remained open indicates that a plaintiff "has not proved that his dismissal resulted from anything other than a legitimate reason, *i.e.*, elimination of the position or his own incompetence." 643 F.2d at 920. However, the Court hastened to add that satisfying all elements of the *McDonnell Douglas* formula is "not the only logical means of raising an inference that an employment decision (hiring or firing) was based on discriminatory considerations." *Id.* at 920–921. One alternative method would be by direct proof of discriminatory animus, *i.e.*, a showing that an employer told his employee that he is being fired because of his race. *Cf. Gillin v. Federal Paper Board Company, Inc.*, 479 F.2d 97, 102 (2d Cir.1973) (direct evidence of sex discrimination). The Court notes, in this regard, that contrary to defendant's assertions, direct evidence of racial animus does not require plaintiff to prove that a similarly situated white employee was treated more favorably than his black counterpart solely due to his race. Memorandum of Law in Support of Defendant Beth Israel's Motion for Summary Judgment at 15–16, n. 5. *See Gillin*, 479 F.2d at 102.

In the instant case, the only direct evidence of discrimination proffered by plaintiff consists of certain remarks made to Thermidor by Stark concerning Thermidor's treatment in the Auditing Department. According to plaintiff, immediately following his removal from the housing audit project, but prior to the memo of May 23rd, plaintiff told Stark that he had a right to work at Beth Israel and that it was Pervez who didn't want him there. Stark allegedly retorted, "what do you mean by having the right, because you [are] black you think you have [the] right." Thermidor Dep. at 349. Stark was among the staff members who attended the meeting of June 24, 1983, at which time Thermidor complained that he was not being given responsibilities commensurate with his job title.

Construing all facts in the light most favorable to the non-moving party, *Patrick v. LeFevre*, 745 F.2d at 161, the Court finds that Stark's statements, in addition to evidence proffered that the first three prongs of the *McDonnell Douglas* test are satisfied, constitute sufficient grounds to "raise an inference of discrimination." *Furnco*, 438 U.S. at 577, 98 S.Ct. at 2949. As the Supreme Court stated in *Burdine*, "[t]he burden of establishing a prima facie case is not onerous." 450 U.S. at 253, 101 S.Ct. at 1094. Rather, a prima facie case is established whenever evidence "if otherwise unexplained," makes it more likely than not that an employer's decision was based on "the consideration of impermissible factors." *Furnco*, 438 U.S. at 577, 98 S.Ct. at 2949–50; *Teamsters v. United States*, 431 U.S. at 358, 97 S.Ct. 1866.

■ We now turn to whether plaintiff has made out a prima facie case of retaliation. Pursuant to 42 U.S.C. § 2000e–3(a), the central inquiry in this case is whether plaintiff's filing of a complaint with EEOC, or threat to do so, in any way precipitated his discharge. Section 704 provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... to discriminate against any individual, ... because he has opposed any practice made an unlaw-

ful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e–3(a).

 In order to make out a prima facie case of retaliation under Title VII, a plaintiff must demonstrate: (i) that he engaged in protected activity under Title VII (i.e., filed a complaint with the NYSDHR and the EEOC), (ii) that defendant, the alleged retaliator, knew of plaintiff's action, (iii) that defendant's employment decision disadvantaged plaintiff, and (iv) that a causal connection exists between the protected activity and the disadvantageous employment action. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1986). In the case at bar, plaintiff filed a complaint with the NYSDHR and the EEOC on August 8, 1983, alleging discrimination. Plaintiff was terminated on January 4, 1984. The filing of a complaint with the EEOC is precisely the type of protected activity contemplated by 42 U.S.C. § 2000e–3(a). *See EEOC v. Kallir, Phillips, Ross Inc.*, 420 F.Supp. 919 (S.D.N.Y., 1976) (Weinfeld, J.), *aff'd without opinion*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). It is undisputed that defendant knew of Thermidor's filing of a complaint with the NYSDHR. Bieber Dep., at 60. Therefore, the first three prongs of the prima facie test are satisfied. The Second Circuit has held that proof of a causal connection between plaintiff's discharge and his filing of a employment discrimination complaint may be established indirectly merely by a showing that the protected activity was followed closely by the alleged discriminatory treatment. *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986). In the instant case, such a showing has been made inasmuch as plaintiff's discharge occurred five months after his filing of a complaint with the EEOC.

## II. Rebuttal

 Plaintiff has thus established a prima facie case of discrimination in regard to both the issue of wrongful termination and retaliatory discharge. As the Supreme Court noted in *Burdine*, establishment of the prima facie case

in effect creates a presumption that the employer unlawfully discriminated against the employee.

\* \* \* \* \* \*

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected ... for a legitimate, nondiscriminatory reason.

*Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. The burden of rebuttal imposed upon an employer is "merely that of proving that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race." *Furnco*, 438 U.S. at 577, 98 S.Ct. at 2950. In order to dispel the adverse inference created by a prima facie showing, an employer need only "articulate some legitimate, nondiscriminatory reason for the employer's rejection." *Id.* at 577–78, 98 S.Ct. at 2950 (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Therefore, the Court must now address whether defendant has satisfied its burden of rebuttal by demonstrating a legitimate nondiscriminatory reason for the discharge. *Burdine*, 450 U.S. 248, 258–59, 101 S.Ct. at 1096–97. *Lieberman v. Grant*, 630 F.2d 60, 65 (2d Cir.1980).

 Because it is incumbent upon an employee to prove that a nondiscriminatory reason was pretextual, an employer, at the rebuttal stage, need not prove the absence of discriminatory motive. Otherwise, too great a burden would be placed on a defendant. *McDonnell Douglas* makes clear that the burden of persuasion rests at all times with the plaintiff and that the employer's burden is simply to articulate a legitimate nondiscriminatory reason for his actions. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1011–12 (1st Cir.1979); *Meiri v. Dacon*, 759 F.2d at 996 n. 11. An employer's explanation of its reasons must be clear and specific, *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.

2d 536 (1972), as they are in the case at bar.

■ In the instant case, Beth Israel has adduced evidence that Thermidor's employment was terminated because: (i) his productivity was low, (ii) he had loud disputes with fellow employees and was generally disruptive, (iii) he held meetings in his office with non-Auditing personnel, thereby prohibiting access to Auditing records by other employees, and (iv) he refused to accept directives from his superiors.

It is widely acknowledged that reasons such as low productivity and conflicts with persons in positions of authority constitute legitimate nondiscriminatory reasons justifying discharge. *Davis v. State University of New York,* 802 F.2d at 642; *Gillin v. Federal Paper Board Co. Inc.,* 479 F.2d at 101 (employee who was "the source of continuing dissention in the office" was not unlawfully retaliated against for filing a charge with the EEOC). *See Johnson v. Allyn & Bacon Inc.,* 731 F.2d 64, 73 (1st Cir.), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984); *Frausto v. Legal Aid Society,* 563 F.2d 1324, 1328–29 (9th Cir.1977). Therefore, the Court now finds that Beth Israel has satisfied its burden of articulating a legitimate reason for terminating Thermidor's employment.

### III. Pretext

Having determined that defendant has successfully rebutted plaintiff's prima facie case, the burden now falls upon plaintiff to:

> prove the existence of factual issues demonstrating that the stated reasons were merely a pretext for discrimination. *See Burdine, supra,* 450 U.S. at 256–57. [101 S.Ct. at 1095–96] An employee may satisfy this ultimate burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's preferred explanation is unworthy of credence." *Id.* at 256. [101 S.Ct. at 1095]

*Meiri,* 759 F.2d at 997.

With regard to the latter category articulated by the Court in *Burdine,* plaintiff has failed to adduce evidence sufficient to demonstrate that Beth Israel's claim of unsatisfactory job performance is unworthy of credence. Rather, plaintiff merely offers conclusory statements that his performance must have been satisfactory because he was never informed of his employer's dissatisfaction until the time of his discharge.

The ultimate inquiry in assessing whether an employer's charge of unsatisfactory job performance is legally sufficient to dismiss a Title VII claim at the summary judgement stage is whether an employee's performance met "his employer's legitimate expectations." *Huhn v. Koehring Co.,* 718 F.2d 239, 244 (7th Cir.1983) (summary judgment granted where plaintiff unable to demonstrate affirmatively that his performance met his employer's legitimate expectations); *Meiri,* 759 F.2d 995; *Reich v. New York Hospital,* 513 F.Supp. 854, 859 (S.D.N.Y.1981). "In determining whether an employee's job performance is satisfactory, courts may—as they often must—rely on the evaluations rendered by supervisors." *Meiri,* 759 F.2d at 995. *See Knight v. Nassau County Civil Service Comm'n,* 649 F.2d 157, 162 (2d Cir.), *cert. denied,* 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed. 2d 87 (1981). Thus in the case at bar, the Court must rely on the evaluations of Bieber, who unequivocally stated that Thermidor's work was unsatisfactory, and stated specific instances in which Thermidor's work was unsatisfactory. *See supra* at 405–406.

Thermidor's only evidence that his work was satisfactory rests in his claim that he was never apprised of "any complaint, written complaint or oral complaint about my work." Thermidor Dep., at 161. However, the Court observes that due to plaintiff's management position he was not subject to written job evaluations. Furthermore, plaintiff acknowledges that on at least one occasion, July 15, 1982, Pervez wrote memos criticizing Thermidor's attitude towards both his work and his co-workers. Plaintiff's Statement of Material Facts in Dispute Pursuant to Rule 3(g) at 4–5. According to Bieber's memorandum to James Stark, dated February 17, 1983, Bieber had

also verbally expressed his dissatisfaction to Thermidor concerning his low productivity. Bieber Dep., annexed thereto as Exhibit 20. Finally, it is undisputed that Thermidor's performance was sharply criticized during the meeting of June 24, 1983, by Bieber and several other members of the Beth Israel staff. These criticisms were made known to plaintiff. Moreover, it is significant to note that the Seventh Circuit in *Huhn v. Koehring* explicitly held that the fact that an employee was unaware of his employer's dissatisfaction is irrelevant to a court's inquiry on this issue. *Huhn*, 718 F.2d at 244.

Because plaintiff has provided no evidence sufficient to show that he performed his duties to the satisfaction of his employer, other than mere conclusory allegations, plaintiff has failed to demonstrate that his employer's accusations of poor job performance were only a pretext for race discrimination. *See* Fed.R.Civ.P. 56(e); *Barnett v. Howaldt*, 757 F.2d 23, 25–26 (2d Cir.1985). As the Second Circuit counseled in *Meiri*, "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Id.* at 998.

In the alternative, plaintiff may maintain that Stark's statements indicate that a "discriminatory reason more likely motivated" defendant to discharge plaintiff than any other reason. Drawing all reasonable inferences "in favor of the party against whom summary judgment in sought," *Patrick v. LeFevre*, 745 F.2d at 160, the Court acknowledges that Stark's remarks may reflect prejudicial sentiment.[1] Assuming that Stark's comments indicate discriminatory animus, they must still be considered in light of all circumstances surrounding the incident in order to evaluate accurately their weight in contributing to Thermidor's discharge. Thus it is important to recognize that the remarks were made by the Director of Human Resources and not by Martin Bieber, Thermidor's direct supervisor, who was principally responsible for terminating Thermidor's position. It was Bieber who evaluated Thermidor's performance and characterized his work as "borderline satisfactory." It was Bieber who made the initial decision to terminate Thermidor's employment at the end of 1983, and Bieber who signed the letter of termination. Stark was merely one of several Beth Israel officials present during the June 24, 1983 meeting.

While there is nothing in the record to suggest that Stark played a role in the termination decision, it is clear that Stark played a key role in the termination process inasmuch as Bieber relied on Stark in accordance with the usual personnel procedure in accomplishing Thermidor's termination. Bieber Dep., at 41. Therefore Stark advised Bieber as to what steps to take in order to process Thermidor's termination. He drafted the termination letter based on Bieber's reasons for termination. In addition, it was Stark who verbally informed Thermidor of his termination in the presence of Bieber. Bieber Dep., at 58. However, Stark did not initiate the termination nor was he responsible for formulating the reasons listed for the discharge. In sum, Stark's limited role in the termination process precludes a finding that his racial animus was responsible for Thermidor's discharge. Thus, the Court concludes that Stark's comments represent only an isolated and unrelated instance of racial tension in the work place, which is alone insufficient to establish a finding of pretext. *Martin v. St. Joe Container Co.*, 817 F.2d 105 (6th Cir.1987). As there have been no allegations of "direct" discrimination by Bieber, plaintiff has failed to show that any "discriminatory reason more likely motivated" his employer than Bieber's legitimate dissatisfaction with his job performance. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

■ In *DeCintio v. Westchester County Medical Center*, 821 F.2d 111 (2d Cir.1987), the Second Circuit held that the factual

---

**1.** The Court also acknowledges that Stark's comment may be subject to a less harsh interpretation (*i.e.,* that black employees are not entitled to *more favorable* treatment than white employees).

question of whether an employer committed retaliatory discrimination in violation of Title VII precluded summary judgment. In *DeCintio*, however, unlike the instant case, plaintiff adduced substantial evidence that defendant's reasons for discharge were mere pretext and a genuine issue of material fact therefore existed. *See Anderson v. Liberty Lobby*, 106 S.Ct. at 2510. In that case, appellant alleged that he was fired as a result of his prominent role in representing a group of disaffected respiratory specialists. Appellees countered that DeCintio was discharged for violating hospital policy by failing to respond properly to emergency situations on two occasions.

DeCintio maintained that he acted properly on the occasions in question. This contention was corroborated by the sworn affidavit of the Chief of Respiratory Therapists at the medical center. Furthermore, DeCintio proffered, through party admissions and other testimony, evidence that similarly situated employees who acted as DeCintio had during emergency situations were never disciplined for their derelictions in failing to follow hospital procedure. Thus the Court concluded that there was no adequate showing that plaintiff acted in contravention of established policy and yet there was evidence of retaliatory animus on the part of the hospital. *DeCintio*, 821 F.2d at 115; *see Hill v. Coca Cola Bottling Co.*, 786 F.2d 550, 553 (2d Cir.1986). Clearly, the case at bar is easily distinguishable from *DeCintio*. Here, plaintiff has adduced no evidence that his job performance was considered satisfactory by anyone who exercised authority over him. Moreover, plaintiff has not charged that other workers who were similarly unproductive and had difficulties working with fellow staff members were never discharged. Thus, unlike *DeCintio*, plaintiff in the instant case has failed to demonstrate that defendant's well-documented claim of unsatisfactory job performance was mere pretext for discriminatory termination.

■ Finally, the Court notes that plaintiff's opposition papers were neither filed nor served in accordance with this Court's scheduling order.[2] For this reason, the Court may, within its discretion, refuse to consider plaintiff's position concerning defendant's motion. *Davidson v. Keenan*, 740 F.2d 129, 132 (2d Cir.1984); *Cunningham v. Safeway Trails, Inc.*, No. 84 Civ. 3936, *slip op.* at 2 (S.D.N.Y. June 14, 1985) [available on WESTLAW, 1985 WL 1684] (available on LEXIS, Genfed library, Dist file), *aff'd without opinion*, 795 F.2d 78 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986). Plaintiff's failure to respond to defendant's motion for summary judgment in a timely manner constitutes an independent ground for granting defendant's motion. Thus for both substantive reasons, and as a procedural matter, defendant's motion for summary judgment should be granted.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is hereby granted. The complaint is accordingly dismissed.

SO ORDERED.

---

2. Defendant moved for summary judgment on August 3, 1987. By stipulation, plaintiff's opposition papers were due to be filed on September 3, 1987. On or about September 1, 1987, plaintiff's counsel requested and was granted an extension by defendant's counsel until September 25, 1987. A stipulation embodying the new filing schedule was filed with the Court on September 3, 1987 and "So Ordered" on September 4, 1987. However, plaintiff failed to file any opposition papers with the Court until September 29, 1987. Plaintiff did not serve these documents upon defendant until September 28, 1987. The postage meter stamp on the envelope was apparently back-dated in an attempt to simulate a September 25th mailing. Because the postage meter's month was changed along with the date, the stamp imprinted on plaintiff's envelope read "Aug. 25, '87".