Frances WEEMS, Plaintiff-Appellant,

v.

BALL METAL AND CHEMICAL DIVISION, INC., Defendant-Appellee.

No. 83–5544.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 19, 1984.

Decided Feb. 4, 1985.

---

Dorothy B. Stulberg, argued, Mostoller & Stulberg, Oak Ridge, Tenn., for plaintiff-appellant.

William C. Bovender, argued, Douglas S. Tweed, Hunter, Smith & Davis, Kingsport, Tenn., for defendant-appellee.

Before NATHANIEL R. JONES, Circuit Judge, and JOHN W. PECK and BAILEY BROWN, Senior Circuit Judges.

BAILEY BROWN, Senior Circuit Judge.

This is an action brought pursuant to the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., by Frances Weems, a black female, against Ball Metal and Chemical Division, Inc. and Lloyd Gillespie. In her complaint, Weems alleged that she was discharged on July 1, 1977 as an employee of Ball at its plant at Greeneville, Tennessee "without cause and for no reason other than her race and sex and in retaliation for her statements made to the E.E.O.C. [Equal Employment Opportunities Commission] representative and because of her filing of a complaint with the E.E.O.C." Weems further alleged that defendant Gillespie, who was a fellow employee and president of the local of the union to which Weems belonged, refused, because of her race and sex, to process her grievance based on her discharge.

With the consent of the parties, the case was tried before Magistrate Robert P. Murrian as is authorized by 28 U.S.C. § 636.

Although Weems alleged that her discharge was partly in retaliation for her having filed a complaint with the E.E.O.C., it was without dispute that the only complaints filed by Weems were *after* her discharge and therefore Weems did not at the trial and does not on appeal press that contention.[1] Moreover, with respect to the claim of retaliation because of Weems' statements made to the E.E.O.C., it developed that, during an E.E.O.C. investigation of a complaint made by two other employees about two years before her discharge, Weems was called in by the investigator and gave a statement. However, there was no evidence as to the content of the statement and, more importantly, no evidence that the Ball management had had any knowledge as to such content. As a result, the magistrate determined, at the conclusion of Weems' case-in-chief, that there was no evidence of retaliatory discharge based on her having given this statement and this claim was dismissed under Fed.R.Civ.P. 41(b), the magistrate making the above findings pursuant to Rule 52 in his memorandum filed after trial was concluded. We agree with this dismissal; although there was no evidence to support the contention, it is sufficient for affirmance of dismissal under Rule 41(b) to hold, as we do, that Weems had not carried her initial burden on that issue.

Further, at the conclusion of Weems' case-in-chief, the magistrate dismissed the claim against defendant Gillespie pursuant to Rule 41(b). As stated, the claim was that Gillespie, as local union president, had refused, because of her race and sex, to institute a grievance following her discharge. It developed, however, that, under the collective bargaining contract, the pres-

---

1. The E.E.O.C., when it issued a right to sue letter, found "no reasonable cause" to believe Weems' charges were true. This finding, in the sound discretion of the trial court, may be ad-mitted in evidence. *Heard v. The Mueller Co.,* 464 F.2d 190, 194 (6th Cir.1972). There is no indication that the magistrate gave the finding any weight.

ident of the local had no part to play in instituting a grievance. Moreover, it was without dispute that, on a prior occasion, Gillespie, by intervening, had persuaded Ball not to suspend Weems. Lastly, and perhaps most importantly, as the magistrate stated, it is difficult to believe that Gillespie, a black man and recent president of the local chapter of the National Association for the Advancement of Colored People, would have discriminated against Weems because of her race. The magistrate made the above findings on this issue in the memorandum filed after the trial was concluded, and we agree that Weems had not carried her initial burden on this issue.

The magistrate determined, on the other hand, at the conclusion of the proof-in-chief, that Weems had made a prima facie case that her discharge was motivated by her race and sex and therefore denied Ball's dismissal motion at that point. Accordingly, the remaining witnesses were heard and the case taken under advisement. In a careful and full opinion, the magistrate determined that Weems had not, in the light of Ball's proffered reasons for her discharge and the evidence in support thereof, carried her burden of persuasion as is required by *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).[2] The magistrate, on the contrary, found that, more likely than not, Weems was discharged because of a poor work performance, difficulty in getting along with some of her fellow employees, and her unwillingness to accept supervision.

Fed.R.Civ.P. 52(a) provides in part:

**2.** In *Aikens*, the Court, interpreting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), held that if the trial judge denies defendant's motion for dismissal after completion of plaintiff's case-in-chief on the ground that plaintiff has made a prima facie case and if defendant offers evidence in support of nondiscriminatory reasons for its action, the *Burdine* presumption "drops from the case" and "the factual inquiry proceeds to a new level of specificity." *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1482, 75 L.Ed.2d at 410. The question then becomes for the trial

Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

The sole question presented, then, is whether the magistrate's findings are clearly erroneous.

In arriving at his finding that Ball was not motivated by racial or sexual bias in discharging Weems, the magistrate carefully discussed and set out his subsidiary findings which we summarize.

Weems was employed by Ball in 1970 and remained employed, despite her contention that her life there from the beginning was a "nightmare," until her discharge in 1977. Weems' job was that of an inspector of battery cans (used in the manufacture of dry-cell batteries) as they passed before her on a conveyor belt prior to their being off-loaded and packed for shipment.[3] There was a device at the end of the conveyor which picked up inspected cans and placed them in a shipping box that was placed in the "nest" by an off-bearer. Weems controlled this device and, while inspecting cans, could glance down and see whether there was a box in the "nest" to receive cans. In 1976, Weems allowed at a particular time three successive loads of cans to be removed from the conveyor and deposited with no box in place to receive them, causing the cans to be scattered about the floor. Weems received a five-day suspension without pay which she grieved and ultimately lost. This was the only grievance Weems ever filed.

At times there would be overflows of battery cans on the conveyor caused by inspection slow ups. These in turn could

judge, *Aikens* holds, whether plaintiff has carried the burden of persuasion of showing intentional discrimination, as would be true in other civil litigation.

**3.** Almost all inspectors were women and almost all off-bearers, a job which required more strength, were men. The wage rates were the same. Since almost all inspectors on all lines and all shifts were women, it is difficult to conceive of discrimination on the basis of sex.

be caused by an unduly large number of faulty cans but also could be caused by the inspector not tending to her job. In 1975, Weems · had on an occasion a particularly large overflow that her supervisor thought was due to her poor performance. Ball management prepared a written warning notice and considered suspending Weems without pay for five days, but Gillespie intervened, suggesting that a grievance would be filed on the basis of discrimination[4] and management decided against suspension. In 1977, as a result of another overflow situation of Weems, Ball management prepared a written warning notice and imposed a five-day suspension with recommendation of dismissal which was carried out and this action followed.

Through the years, Weems received written warnings or was counseled concerning various problems. Some had to do with staying on breaks too long, leaving work early, and using profanity at and around other employees. Weems has made much of the claim that her personnel file was over-documented and that this indicated that management was out to get her. Weems particularly emphasizes that her file contained false statements that she carried a switch-blade knife and had a criminal record. One witness, however, Ira Taylor, a lead man but a member of the bargaining unit, testified that he had seen a long bladed knife that Weems carried and that she had told him about having been in a fight years before with another woman for which she had been jailed. Taylor indicated that he was the source of this information in the file. In any event, as the magistrate found, it would be mere supposition to conclude that Weems' personnel file was full because management was out to get her or was full because management anticipated that, if it ever discharged Weems, it would have a discrimination case on its hands that it would have to defend.

The magistrate pointed out that, while Weems complained a great deal about her work assignments (there were eight inspection lines as to which there were perceived

advantages and disadvantages), Weems did not exercise her considerable seniority as to which line she would work. Weems filed, as stated, only the one grievance (about her 1976 suspension), and instead, became uncommunicative and surly when she thought she had been treated unfairly.

As noted by the magistrate, if Ball had wanted to discharge Weems, it had a legitimate basis for firing her because of infractions and under the terms of the collective bargaining contract long before it did.

We therefore conclude that the magistrate's decision that Weems was not discharged because of her race or sex is not clearly erroneous.

AFFIRMED.

NATHANIEL R. JONES, Circuit Judge, dissenting.

I am unable to agree with the views of the majority.

As the majority notes, the sole question presented on appeal is whether the magistrate's findings are clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *see also Kennedy v. Commissioner*, 671 F.2d 167, 174 (6th Cir. 1982) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Appellate review of the magistrate's conclusions of law, however, is not controlled by the "clearly erroneous" rule. Instead, this Court may freely review the magistrate's legal conclusions, ultimate findings of fact, and mixed questions of fact and law. *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 143, 143 n. 19 (6th Cir.1983).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248,

---

**4.** The collective bargaining contract prohibited

discrimination on the basis of race and sex.

101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) the Supreme Court set out a tripartite scheme of proof allocation for Title VII cases. As applied to the instant case, that scheme is as follows. First, Weems had to establish by a preponderance of the evidence a prima facie case of employment discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093. Second, because establishment of that prima facie case created a rebuttable presumption of unlawful discrimination and shifted the burden of production to Ball Metal, Ball Metal had to articulate legitimate, nondiscriminatory rationale for Weems' discharge. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Third, because that mere articulation shifted the burden of production back to Weems, she had to show by a preponderance of the evidence that Ball Metal's articulated, legitimate, nondiscriminatory rationale was pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. The burden of persuasion, however, never shifted from Weems to Ball Metal. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

Although proof of a prima facie case differs with the facts, *McDonnell Douglas Corp.*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13, Weems could have established a prima facie case either under a theory of disparate treatment, disparate impact, or both. *See Chrisner v. Complete Auto Trans., Inc.*, 645 F.2d 1251, 1257 (6th Cir. 1981). Weems elected to establish her prima facie case of Ball Metal's gender and racial discrimination under a disparate treatment theory. The magistrate, however, did not determine whether Weems successfully established that prima facie case. Instead, the magistrate found that Ball Metal disparately treated Weems because of her "repeated poor performance," but not because of Weems' sex or race. As a result of that finding, the magistrate concluded that Weems failed to meet her burden of persuasion regarding pretext.

Weems' burden of showing pretext is simply one of showing that Ball Metal's

articulated rationale was not the true rationale for her discharge. Weems could have met that burden by demonstrating that a discriminatory reason predominated over Ball Metal's articulated legitimate reason or by undermining the credibility of Ball Metal's articulated legitimate reason. To meet that burden Weems could have used the following three categories of evidence to prove pretext: (1) direct evidence of discrimination, such as discriminatory statements or admission; (2) comparative evidence; and (3) statistics. Weems, however, did not introduce statistics into evidence. Instead, she relied primarily upon comparative evidence of discrimination. A review of that evidence is appropriate in relation to the ten reasons that Ball Metal enumerated as examples of why Weems' work was "unsatisfactory and not acceptable."

First, I cite Ball Metal's enumeration of the following examples of Weems' performance as support for its conclusion that her work was "unsatisfactory and not acceptable."

1. [a]llow[ed] unnecessary amounts of battery can overflow to accumulate;

2. [a]llow[ed] the line to back up when other people are assigned to help catch up the overflow;

3. [p]ut no extra effort into the job when the situation require[d];

4. [m]a[de] unnecessary messes around work area and ma[de] no effort to help keep neat;

5. [l]e[ft] work area to visit with other employees whether her work is caught up or not;

6. [had a p]oor attitude toward the company, supervision, union and fellow employees;

7. [c]all[ed] fellow employees bad names in presence of others;

8. [c]ontinu[ously] grip[ed] and complain[ed] about practically everything and everybody on the job;

9. [did] not get along or make an effort to get along with the majority of people;

10. [was the subject of] numerous complaints ... [of] fellow employees [who said] they were tired of doing their jobs and her job too.

Second, I submit that those examples were rebutted by Weems' comparative evidence, which was produced from the testimony of Joyce Fletcher, a white female relief inspector, Doyle Smith, a Black man who worked as a packer for a short period of time in 1979, Grady Black, Jr., McCamey, Weems' supervisor, David Douthat, and, Pack. Fletcher stated that Weems "was a very clean person ... [who] kept her line clean." In fact, in comparison to "people" on other lines, according to Fletcher, Weems was similarly clean. Fletcher, who had an opportunity to observe Weems' attitude stated that, without an objection, Weems helped Fletcher to reduce her overflow, and that Weems worked "well." Fletcher also stated that she had never heard her complain unduly, or use profane language. In fact, Fletcher stated that the men on the lines used profane language, but were never disciplined for that profanity. Although Weems had been disciplined for taking more time than allotted for breaks, for failing to completely fill out her work sheet, and for having an overflow above the normal amount of overflow, Fletcher noted that she had not been disciplined for those same problems.

Smith testified that both he and a Gary Treese, another black male who worked at Ball Metal had been subjected to criticism and discharge. It was suggested that the basis of the criticisms and discharges was racial. Smith indicated that he was discharged because a foreman claimed that he had been drinking. Also, he suggested that Treese was discharged for negative reasons; however, Smith did not state what those negative reasons were.

Black testified that Weems did her job, spent the appropriate amount of time on breaks, was not moody, griped no more than other workers, cursed lightly by saying the word "shit" infrequently and never using the word "goddamn." Black also testified that Weems' packer man, "Win-

ifred, talked a lot." In fact, according to Black, Winifred talked so much to other workers on other lines that Winifred only "stayed at his station some."

Douthat testified that Weems was as clean as others who worked on the lines, usually in good humor, complained no more than others on the line, did her share of the work, and performed an unauthorized minor adjustment on a line machine.

Pack testified that Weems had helped him with his work, did a good job, spent less time away from the line than did other workers, was a jolly person, was as clean as other workers, took long breaks like everyone else, repaired the machine like he had but unlike he was disciplined for the repair, and had an overflow like he had but unlike he was disciplined for the overflow. Pack also testified that Winifred talked a lot and played practical jokes on the job to the extent that he made it difficult for others on the job.

McCamey testified that although he chastized Weems for making an unauthorized repair on the line, Weems "got along" "alright" with others. McCamey also testified that he disciplined Weems only once about her work, had no occasion to warn her about the use of profanity, that discipline for the use of profanity occurred only when the profanity "got extremely bad," and that inspectors usually failed to fill out the necessary paper work. McCamey, however, also testified that he had been involuntarily retired by Ball Metal, but that all supervisors tried to treat each worker alike.

Weems' strongest comparative evidence, therefore, was produced from Fletcher's testimony. Fletcher's testimony regarding Weems' use of profanity, however, was weakened by Grady's and Black's testimony. For example, Fletcher testified that Weems never cursed. Grady testified that Weems infrequently used the word "shit," but never used the word "goddamn." Black testified that Weems cursed lightly by using the word "shit" infrequently and never using the word "goddamn." It is

possible, however, that Fletcher never heard Weems curse.

The strength of that conclusion is based upon the strong corroboration of Fletcher's testimony by Douthat, Black, Grady, Pack, and McCamey. For example, all testified that Weems had a good attitude and that in comparison to the work of co-employees Weems' work was equal. Moreover, Black, Grady, and Pack testified that in comparison to others Weems' was clean, had normal overflow, and did a good job. Both Pack and Douthat noted Weems' unauthorized repair of line machinery. Yet, Pack also noted that other workers had performed unauthorized repairs but were never disciplined for those unauthorized repairs.

As a result, Weems did meet her burden of pretext, since comparably situated white employees, whether female or male, were treated differently. That is, those comparably situated white workers were not disciplined for the same infractions of Ball Metal's rules or policies for which Weems was disciplined. *See Corley v. Jackson Police Dept.*, 566 F.2d 994, 999–1000 (5th Cir. 1978). That differential in treatment, I submit, does not suggest that Weems was discharged for "repeated poor performance" but instead because she was Black. For that reason, I am left with a definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Weems was, in my view, subjected to discrimination on the basis of her race. I, therefore, conclude that the magistrate's decision is clearly erroneous.