98 F.3d 1341
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellant.
v.
FORD MOTOR COMPANY, Defendant-Appellee.
 No. 95-3019.
 United States Court of Appeals, Sixth Circuit.
 Sept. 30, 1996.
 
 Before: MERRITT, Chief Judge, WELLFORD and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 The Equal Employment Opportunity Commission (EEOC), which brought suit against the Ford Motor Company (Ford) on behalf of Ford employee H. Terry Harris, appeals from two adverse evidentiary rulings made against it during a Title VII bench trial. The district court found that Harris had not been discriminated against. We affirm the district court.
 
 
 2
 * In August 1992, the EEOC sued Ford under Title VII, 42 U.S.C. § 2000e et seq., for Ford's alleged racial discrimination against one of its black employees, H. Terry Harris. The EEOC claimed Ford discriminated against Harris by denying him a promotion. The resulting trial was bifurcated in light of pretrial motions, requiring the EEOC to set out a prima facie case in the initial part of the trial beginning in November 1993. At the conclusion of the first phase of the trial, Ford moved for judgment on partial findings according to Fed.R.Civ.P. 52(c) on the ground that Harris was not qualified to compete for the promotion. The judge denied this motion and the trial proceeded to its second phase in November 1994.
 
 
 3
 The EEOC took up Harris's case after Harris filed a charge with the Commission against Ford. Harris was employed at a Ford automotive castings plant in Cleveland, in the Cylinder Block Area. In early 1990, a Grade 8 general supervisor position on the second (day) shift opened up in Core Operations in the Cylinder Block Area. Because there was already another general supervisor position on the second shift, the Cylinder Block Area's Operating Committee [hereinafter "Committee"], which set operations policy, decided to relocate the general supervisor position to the first (midnight) shift. The Committee consisted of three white males and made its policy decisions without writing them down. According to Ford, the new general supervisor position was to have dual responsibility for both production and maintenance (skilled trades) workers on the first shift. Ford maintained that the Committee had identified maintenance problems on the first shift, mostly associated with an unacceptable level of equipment down-time that was impairing the efficiency of operations during all other shifts.
 
 
 4
 The Committee did not advertise or post the availability of the general supervisor position, and there was no procedure by which an interested supervisor, or anyone else, might have applied for the position. The Committee decided to fill the position from an internal pool of candidates that included all supervisors in the Cylinder Block Area. The Committee asserted at trial that it quickly narrowed its focus only to those supervisors with maintenance experience, and eliminated from consideration those supervisors who lacked a maintenance background regardless of their seniority or production experience. One of the Committee's members testified that Harris, who lacked such experience, was among those recommended and considered for the position, however. The members of the Committee also testified, contradicting earlier deposition testimony, that they had no need to interview the candidates for the positions because they were intimately familiar with the candidates' work, making the selection process essentially a weighing of the strengths and weaknesses of "known quantities."
 
 
 5
 After a series of meetings, the Committee arrived at a list of four maintenance supervisors, all from molding operations, who were said to be the best qualified for the new general supervisor position: Bill Berry, Gregg Briggs, Harry Hoover, and John Sherman, each of whom was white. The Committee ultimately selected Briggs for the position. Briggs was the only candidate with significant prior production supervision experience. He was also cross-trained in maintenance on the job at Ford, and continued after his promotion to function successfully as a maintenance supervisor. Maintenance supervisors at the Cleveland plant, including all four of those individuals considered for the promotion at issue in this case, are classified as Grade 7 for salary purposes because of the greater expertise involved in their jobs compared to the Grade 6 production supervisors. Briggs also had drafting experience, which aided him in performing maintenance work. There is no question that Briggs is eminently qualified for the general supervisor position. Briggs accepted the new position offered to him effective February 16, 1990. The next day, Ford circulated an inter-office memorandum that announced Briggs's promotion and his new responsibility for maintenance supervision.
 
 
 6
 The June 30, 1990 Cleveland Casting Plant Organization Chart showed Briggs's span of control as including only production, and not maintenance supervision. But Briggs was the first supervisor ever to hold a dual production and maintenance supervisor role, so not even his job title reflected his duties.
 
 
 7
 Harris had been working at the Cleveland plant since 1973, and had been on salary since 1977. During the time period he may have been under consideration for promotion to a second shift grade 8 general supervisor, Harris was a grade 6 production supervisor on the third shift. Harris's rating as a production supervisor was "excellent plus" for the evaluation period immediately before the selection process for the general supervisor position began. Harris held no jobs at Ford or elsewhere involving maintenance or maintenance supervisory responsibility. He did not have any degrees in a maintenance field, such as engineering, and his only maintenance training was a six-month automobile repair program he completed while in the military. But there was no "hard and fast" rule at Ford that a maintenance supervisor needed to have such training. Harris had declined past opportunities to enter Ford's cross-training program in maintenance, however.
 
 
 8
 The district court found as a matter of fact after trial that Harris was qualified for the general supervisor position. As a matter of law, the district court concluded that the EEOC had presented a prima facie case that Harris was discriminated against on the basis of his race because he did not receive the general supervisor promotion. The district court also held as a matter of law that Ford had met its burden of production to provide evidence of a legitimate non-discriminatory reason for failing to promote Harris. Ruling against the EEOC, the district court held that the EEOC had failed to carry its ultimate burden of persuasion in that it had failed to show that Ford's reason for failing to promote Harris was pretextual. The district court correctly noted that it needed an evidentiary basis for rejecting Ford's proffered reason for refusing to promote Harris:
 
 
 9
 The Court finds that plaintiff EEOC has not met its burden to prove by a preponderance of the evidence that Ford's proffered reasons for promoting Briggs were not its true reasons. Although the hiring process was incredibly unstructured and informal and was certainly not commensurate with what would be expected of a giant corporation, thereby giving rise to suspicions and doubts as to its fairness, the defects of the process in and of themselves are not sufficient to persuade the Court that the hiring of Briggs was the result of racial discrimination.
 
 
 10
 During this bench trial, the district court made two decisions, declining to admit evidence offered by the EEOC, which form the basis of this appeal. First, several black managers at the Cleveland plant had filed a written complaint in September 1990 with Ford [hereinafter "Black Managers' Complaint"] alleging that "the Cleveland Casting Plant uses discriminatory methods in job promotions, performance evaluations and in merit increases." The EEOC wanted Freda Rockymore, herself a black supervisor at the Cleveland plant, to testify that certain events had occurred and that certain statements had been made to her. In the words of one of the EEOC's attorneys, Rockymore would have testified that, in response to the filing of the Black Managers' Complaint:
 
 
 11
 [A] person by the name of Glenn McGruther came from Ford world headquarters and addressed all blacks and minorities there at Ford Motor Company, had various meetings with them. This is all prior to the Briggs promotion and the time period leading up to the Briggs promotion.
 
 
 12
 Met with black employees at Ford Motor Company and listened to them and tried to understand what their concerns were [sic ].
 
 
 13
 Miss Rockymore would have testified that ... the end result of those meetings [was that] Mr. McGruther promised that the company would look into the matter of their claims of racial discrimination. Her testimony would have revealed that he did subsequently return to Ford to the Cleveland casting plant and told Ms. Rockymore personally that there was a problem of racial discrimination there at the Cleveland casting plant, [that] there was a problem with the way Ford managers treated blacks, and [that] there was a problem with promotions.
 
 
 14
 There was a problem with promotions.
 
 
 15
 She would have testified that blacks are not selected for cross-training when they ask[ ] for it, that blacks are not selected to work on special projects there at the Ford Motor Company that lead to promotions. She would have testified that blacks are not selected to go away from Ford and receive training in new and additional skills that would aid them in their career development at Ford Motor Company.
 
 
 16
 Miss Rockymore would have also testified that blacks have always [experienced] and continue to experience ... an inordinate amount of rejections when they apply for promotions there at Ford Motor Company and that Mr. Harris' [sic ] lack of getting this promotional opportunity in question was only one [in] a series of incidents that occurred there at the Ford Motor Company.
 
 
 17
 J.A. 68-69. [Hereinafter this proffer will be termed the "Rockymore Proffer." ][1]
 
 
 18
 Before this proffer was made, the EEOC had attempted to elicit this testimony from Rockymore, but Ford objected, saying, "[t]his is not a pattern and practice case. It's a one job, one promotion case." The trial court agreed with this contention, noting, "[t]he problem is that this has not been brought as a pattern case, and if we use the rule to allow pattern and practice evidence then every case turns into a pattern case, and I don't know how that can be." Ford's counsel also objected on the grounds of unfair surprise, hearsay, relevance, prejudice, and lack of foundation. Ultimately, the district court ruled on this objection, as follows: "if [Rockymore] has any testimony with respect to any discrimination that she may have suffered as a result of actions by the individuals who were charged with making the determination in this case, she may testify to it. Otherwise, the testimony would not be admissible." The precise legal grounds the district court gave for sustaining the objection are not clear.
 
 
 19
 Ford also objected to the proffer of the Black Managers' Complaint on the same grounds as it had objected to the Rockymore Proffer, but additionally on the basis that the document's date indicated that it had been written months before the promotional decision involving Harris was made.
 
 
 20
 The EEOC then tried to call Harris to have him testify to what he was told by McGruther as a result of the latter's investigation, which seemed very similar to the proffer made for Rockymore [hereinafter "Harris Proffer I"]. Ford objected to this proffer on the grounds of relevance and unfair surprise, as McGruther had not been identified as someone with knowledge relevant to the case by the EEOC. The EEOC responded to the unfair surprise allegation by noting that it had asked one of the Committee members about McGruther during the former's deposition, and that it had produced the Black Managers' Complaint and given it to Ford during discovery. The court stated, "[w]ell, again, if this had been brought as a pattern case, this evidence would certainly be relevant and admissible, but I don't think at this late date that we can change a nonpattern case to a pattern case." Counsel for the EEOC asked the court, "does that even run to excluding Harris' [sic ] individual testimony about admissions made to him by Mr. McGruther on the specific issue in this case?" The court responded in the affirmative. [This attempt to have evidence admitted about McGruther's conclusions that may have specifically related to Harris's promotion is hereinafter termed "Harris Proffer II"].
 
 
 21
 In terms of Harris Proffer II, it is ambiguous whether the court was excluding evidence about Harris's individual claim, i.e., the "specific issue in this case" of the Committee deciding not to promote him to general supervisor, or whether the court was excluding evidence of disparate treatment of black managers generally, which the EEOC was proffering to support Harris's individual claim. However, the exchange over Harris Proffer I probably establishes that, in context, the EEOC meant the latter, so that Harris Proffer I and Harris Proffer II are really not different in terms of the nature of the evidence sought to be admitted. Despite the ambiguity related to Harris Proffer II, the EEOC is not challenging the district court's ruling on the basis that Harris was going to testify as to something McGruther told him about his own particular promotion. The court's decision to exclude the Black Managers' Complaint, the Rockymore Proffer, and the Harris Proffers I & II are collectively the first evidentiary ruling the EEOC challenges on appeal [referred to hereinafter as the "McGruther evidence"].
 
 
 22
 The second evidentiary ruling that the EEOC challenges is the court's refusal to admit the EEOC's cause determination--its administrative investigation of Harris's EEOC complaint and its conclusion that the case had enough merit to prosecute on Harris's behalf. The relevant portion of this cause determination noted:
 
 
 23
 Examination of the records, documents, and testimony contained in the investigative file reveals that the criteria used [by Ford] and the application of the criteria in the matter [were] at best highly suspect, inconsistent, pretextual and deceptive. Nonetheless, the record shows that Charging Party [Harris] possessed superior qualifications in all categories required to perform the job of General Supervisor in his department than [sic ] did the selected employee.
 
 
 24
 The district court ruled on the admissibility of the cause determination as follows:
 
 
 25
 It's my understanding that [in] the Sixth Circuit ... it's [within] the discretion of the court whether to admit determinations of administrative agencies, and it has been my policy [that in] discrimination cases both where there is a jury and without a jury ... I do not admit the administrative findings....
 
 
 26
 * * *
 
 
 27
 * * *
 
 
 28
 It is my understanding [that] the position of the Sixth Circuit is it's within the trial court's discretion. The trial court's decision [in] that regard will not be disturbed on appeal. It has been my consistent policy not to admit administrative findings of the cases. Therefore, I will not admit [the EEOC's cause determination.]
 
 
 29
 The EEOC filed a timely notice of appeal from these evidentiary rulings, noting that these evidentiary rulings had a categorical nature making them of sufficient general importance to EEOC litigation nationwide to warrant appeal.
 
 
 30
 II. RELEVANCE OF PATTERN OR PRACTICE EVIDENCE IN A
 
 NON-PATTERN OR PRACTICE CASE
 
 31
 It has been said that an abuse of discretion standard is "the standard under which [evidentiary] errors of a trial court are tested on appeal." United States v. Rios, 842 F.2d 868, 872 (6th Cir.1988) (per curiam) (quoting United States v. Mahar, 801 F.2d 1477, 1495 (6th Cir.1986)). While this is generally true, there are a number of instances in which the application of the Federal Rules of Evidence has been held to involve questions of law and thus justify de novo review.
 
 
 32
 The EEOC cites a number of cases holding that errors of law in the admissibility of evidence constitute an abuse of discretion. See, e.g., United States v. Taplin, 954 F.2d 1256, 1258 (6th Cir.1992) (holding that it was an abuse of discretion to make an erroneous legal interpretation of the hearsay rules). This interpretation of abuse of discretion review is confusing because it essentially equates abuse of discretion review with de novo review. The more sensible approach is to differentiate between evidentiary rulings so inextricably tied into the facts of a case that a deferential abuse of discretion standard of review is appropriate and those evidentiary rulings presenting pure questions of law construing the Federal Rules of Evidence, where this court will show a district court no deference.
 
 
 33
 The EEOC attempts to frame the district court's decision not to admit the Black Managers' Complaint, the Rockymore Proffer, and the Harris Proffers I & II as an incorrect ruling of law, claiming that the district court held "in blanket terms--that such general practice evidence, while probative in a 'pattern or practice' case, has no relevance to the plaintiff's showing in an individual disparate impact treatment case." EEOC's Brief at 11. The district court did not state its conclusion that the contested evidence was inadmissible in "blanket terms," as the EEOC alleges. Thus, when the district court refused to admit Harris Proffer II, it stated: "Well, again, if this had been brought as a pattern case, this evidence would certainly be relevant and admissible, but I don't think at this late date that we can change a nonpattern case to a pattern case." (Emphasis supplied.) There is nothing in this statement to indicate that the district court was doing anything other than making a particularized relevance ruling.
 
 
 34
 Although it is not clear from the record that all of the McGruther evidence was excluded on relevance grounds, we will make this assumption for purposes of applying harmless error analysis below. "In the context of an evidentiary ruling, abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." Polk v. Yellow Freight Sys., 876 F.2d 527, 532 (6th Cir.1989).
 
 
 35
 Fed.R.Evid. 401 defines "Relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under this standard, it is clear that the Black Managers' Complaint, the Rockymore Proffer, and the Harris Proffers I & II were relevant. While this evidence would be more relevant in a pattern or practice case, this does not mean that it is irrelevant in a case of individual discrimination. Because many disputed facts cannot be determined with absolute certainty, Rule 401 focuses on probabilities. And if one had to bet on whether Harris was actually denied a promotion by Ford on account of his race, one would certainly want to know whether any other Ford managers agreed with Harris that the promotional prospects of blacks at that company were dismal, and that a Ford official agreed that there were problems with the promotion of black workers somewhere in the Ford Motor Company, even though these problems were of an unspecified nature.
 
 
 36
 Moreover, the Supreme Court has stated in one of the seminal civil rights cases, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973), that "general policy and practice [evidence] with respect to minority employment" may be relevant in an individual disparate impact case to the determination of whether the presumptively non-discriminatory reasons for the employment action taken by an employer were pretextual. In light of the fact that pattern or practice evidence remains relevant to the ultimate issue of whether an employer has discriminated on the basis of race, even in an individual discrimination case, and in light of McDonnell Douglas's indication of particular relevance on the intermediate issue of pretext, it was an abuse of discretion for the district court to have excluded the Black Managers' Complaint, the Rockymore Proffer, and the Harris Proffers I & II.
 
 
 37
 Ford points to two cases, however, to support its argument that the district court correctly ruled that the McGruther evidence was irrelevant in a pattern or practice case. First, in Ang v. Procter & Gamble, 932 F.2d 540, 547 (6th Cir.1991), the plaintiff tried to establish that his employer's reasons for discharging him were pretextual by attempting to cross-examine various supervisors about other employees who had been discharged, in order to show that the employer would never let someone go for the reasons he posited in the questions put to the supervisors. Ang holds that it was not an abuse of discretion, on relevance grounds, for the magistrate judge in an evidentiary hearing to prevent the plaintiff in that case from asking the proposed questions without first establishing that he was terminated for the precise reasons posited in those questions. The link between the McGruther evidence and a claim that Ford's purported non-discriminatory reasons were not credible in light of a general "problem" with failing to promote blacks at Ford is not as tenuous as the rejected connection in Ang, however. In Ang, the concern was that the plaintiff would not fairly state in his questions concerning other discharged employees the allegedly non-discriminatory reasons that he, the plaintiff, had been given for being terminated by his employer. Here, the EEOC did not have that kind of control over the potential logical connection between the McGruther evidence and Ford's proffered reasons for not promoting Harris. (However, the community of interests between Rockymore, other black managers at Ford, and the EEOC may have raised similar reliability concerns about the McGruther evidence.)
 
 
 38
 While Ang is clearly not sufficient support for the district court's exclusion of the McGruther evidence on relevancy grounds, the second case Ford points to, Schrand v. Federal Pac. Elec., 851 F.2d 152, 156 (6th Cir.1988), presents a more colorable issue. Schrand holds as a matter of law that evidence of age discrimination against other workers employed by the same firm is irrelevant in "light of the fact that [the plaintiff] has stated expressly that he was not attempting to establish a pattern and practice case." Ibid. We are not bound by Schrand because that case involved a different statute, however. Cf. United States v. Edge, 989 F.2d 871, 876 (6th Cir.1993) (one panel of the Sixth Circuit will not overrule another); 6th Cir.Internal Operating Procedures 22.4.1 (same). We conclude that it was an abuse of discretion for the district court to have ruled that the McGruther evidence was irrelevant.
 
 
 39
 Nevertheless, we cannot agree with the EEOC that we should remand this case with instructions to the district court to consider expressly the McGruther evidence. Fed.R.Civ.P. 61 requires us to determine whether the error here was harmless:
 
 
 40
 No error in either the admission of evidence or the exclusion of evidence ... is ground for granting a new trial ... or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.
 
 
 41
 The district court found that the EEOC had not carried its burden with respect to proving that Ford's stated non-discriminatory reasons for not promoting Harris were pretexutal. To show that Ford's explanation is not credible, the EEOC would have to show by a preponderance of the evidence that (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate Ford's decision; or (3) the reasons given were insufficient to motivate Ford's decision. Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir.1994).
 
 
 42
 There was more than sufficient evidence in the record from which the district court could conclude that Ford had a basis in fact for desiring to promote someone to the general supervisor position with maintenance skills. The various McGruther evidence as described in the proffers and in the Black Managers' Complaint does not have the potential to contradict this evidence. It is simply too general.
 
 
 43
 Second, the McGruther evidence does illuminate the issue of whether Ford's reasons for not promoting Harris were pretextual. However, to make the showing that this kind of circumstantial evidence demonstrates that Ford was indeed misrepresenting its true motives, the EEOC must show that the McGruther circumstantial evidence "overwhelms" the competing evidence in the record. Manzer, 29 F.3d at 1084. The McGruther evidence is not overwhelming.
 
 
 44
 Third, the McGruther evidence does not demonstrate that the maintenance experience explanation offered by Ford was insufficient to justify not promoting Harris. A credible concern that a general supervisor have knowledge of the disciplines involved in skilled trades and the ability to supervise such tradesmen is clearly legally sufficient to support promoting a person with that kind of knowledge and ability over someone in a protected class who lacked such knowledge and ability. In any event, this third part of the Manzer test may be inapplicable in a promotion-based Title VII case. In considering this final part of the test in Manzer itself, the court considered evidence showing that workers outside the protected class were fired even though they had engaged in substantially similar conduct to that of the plaintiff alleging discrimination. In a promotion case, of course, the fact that there are others who are not in the protected class with qualifications similar to the Title VII plaintiff is irrelevant to the determination of whether an employer's purported reasons for failing to promote the plaintiff are pretextual.
 
 
 45
 As the EEOC could not have used the McGruther evidence to make any of the Manzer showings, the error in failing to admit this evidence here was harmless, because it could not have changed the outcome of the trial. Zamlen v. City of Cleveland, 906 F.2d 209, 216 (6th Cir.1990), cert. denied, 499 U.S. 936 (1991). Therefore we conclude that the district court's error in excluding the McGruther evidence as irrelevant was harmless.
 
 
 46
 III. ADMISSION OF THE EEOC CAUSE DETERMINATION
 
 
 47
 In contrast to the standard of review applicable to the first contested set of evidentiary rulings in this case, the district court rather clearly held that it was not engaging in any individualized exercise of its discretion in ruling that EEOC cause determinations were inadmissible in this case. The district court held that it had the blanket legal authority, under Sixth Circuit precedent, to refuse to admit any EEOC cause determinations, whether in bench or jury trial. This is precisely the kind of evidentiary ruling that is subject to de novo review, as opposed to the abuse of discretion review applicable to the relevance issue discussed above.
 
 
 48
 Weems v. Ball Metal and Chem. Div., 753 F.2d 527, 528 n. 1 (6th Cir.1985), states that an EEOC cause determination "in the sound discretion of the trial court, may be admitted into evidence." On the one hand, it can be argued that the Weems "sound discretion" language means that there may be unsound exercises of discretion in excluding an EEOC cause determinations, implying that a rule permitting a district court invariably to exclude EEOC cause determinations would violate Weems. On the other hand, it can be argued that the question of whether a blanket rule excluding EEOC cause determinations was permissible is an open question after Weems, as Weems related only to the question of whether a judge could ever admit a cause determination. Heard v. Mueller Co., 464 F.2d 190, 194 (6th Cir.1972), in which the Sixth Circuit first decided that cause determinations were admissible in the sound discretion of the trial court, seems to indicate that the latter of these two possible interpretations is the more likely: "Certainly on the basis of the case before us, we are not prepared to hold that all EEOC Investigation reports are per se admissible in every Title VII action involving some or all of the same parties." Thus, the "sound discretion" rule appears to have been adopted merely to avoid a per se admissibility rule, not necessarily to reject a per se inadmissibility rule. Nevertheless, Heard is a weak basis on which to resolve the issue presented here by the EEOC for review. We must squarely face the question of whether it is permissible to institute the blanket rule adopted by the district court.
 
 
 49
 Examining the nature of an EEOC cause determination leads to the conclusion that the district courts should be free to adopt a general rule that refuses to admit these cause determinations in any sort of trial, whether to the court or to a jury. An EEOC cause determination is an examination of the facts surrounding an adverse employment action forming the basis for a Title VII suit. Unlike many statutory administrative decision review procedures, where the courts of appeals owe deference to the factual findings of an administrative agency (and the district courts are typically never involved in judicial review), the Title VII context is not one of these processes. In Title VII cases, either a jury or a district judge is the fact-finder. The district court, and the court of appeals, owes no deference to what the EEOC thought the facts were when it brought the case before the district court.
 
 
 50
 Moreover, an EEOC cause determination carries an evidentiary value of practically zero. When the EEOC chooses to bring a Title VII action on behalf of a civil rights plaintiff, the fact that the EEOC thought there was enough merit to warrant bringing that particular case against an employer is self-evident.[2] Generally, the only plausible value of an EEOC cause determination would be that it presents the evidence of discrimination that the EEOC considered. Presumably, much of that same evidence could be adduced at trial, and therefore the admission of the EEOC cause determination referencing it would be redundant. As for any evidence contained in an EEOC cause determination that is properly excluded at trial, an attempt by the EEOC to admit those parts of the EEOC cause determination becomes a not-too-subtle attempt to end-run the Federal Rules of Evidence.
 
 
 51
 In Heard, 464 F.2d at 194, the Sixth Circuit reasoned that as it was within the sound discretion of the district court to accept an EEOC investigator as an expert witness, it was similarly within a district court's sound discretion to accept the written work product of an EEOC investigator in the form of a cause determination. The expert witness rationale of Heard does not bar the creation of a rule that a district court may categorically refuse to admit the legal conclusions of the EEOC's "experts." The central question in deciding whether the district court's categorical rule is proper remains: What does it mean for a district court to possess "sound discretion," whether the pertinent discretion is framed as discretion to admit an EEOC cause determination or discretion to qualify an EEOC investigator as an expert. Thus, Heard 's expert witness rationale is not helpful in resolving the question presented here of whether a blanket rule barring the admissibility of EEOC cause determinations should be adopted.
 
 
 52
 To bolster its expert witness rationale, the Heard court cited two cases. One was Bridger v. Union Ry., 355 F.2d 382, 387 (6th Cir.1966). Bridger is not a Title VII case. It is a case where a trial judge allowed railroad switchmen to testify as expert witnesses about the safety of a particular railroad crossing. The analogy between the expertise of a railroad switchman and that of an EEOC investigator is strained, to say the least. Bridger is therefore not terribly helpful.
 
 
 53
 The other case the Heard court cites is Gillin v. Federal Paper Board, 52 F.R.D. 383 (D.Conn.1970), rev'd in part on other grounds, 479 F.2d 97, 99-100 (2d Cir.1973). In Gillin, the court was faced with the question of whether to admit an EEOC cause determination under 28 U.S.C. § 1732, which at the time provided that government business records were admissible as evidence of the government action the records memorialized. While § 1732 did not state on its face that it was intended to provide an exception to the general rule against the admission of hearsay, it appears from the Gillin opinion that this was the way the statute was interpreted by courts at the time. See Gillin, 52 F.R.D. at 385 (noting that inquiry for determining admissibility under § 1732 is whether the government's records indicate an "inherent probability of trustworthiness"), quoting Bowman v. Kaufman, 387 F.2d 582, 587 (2d Cir.1967). Therefore, § 1732 was the precursor of Fed.R.Evid. 803(8), the hearsay exception for public records. The Gillin court decided that the EEOC's cause determination in that case was inadmissible under § 1732 because it,
 
 
 54
 is a mishmash of self-serving and hearsay statements and records which contain conflicting opinions, comments and inferences drawn by investigators, potential witnesses, and unidentified persons. This maze of material would thwart rather than ease the trial's efforts. Credibility of the witnesses will play a major role in resolving the conflicting positions of the parties here; justice requires that the testimony of the witnesses be given in open court, under oath, and subject to cross-examination.
 
 
 55
 Gillin, 52 F.R.D. at 386. Thus, even the authority relied upon by the Sixth Circuit panel when it created the "sound discretion" rule in Heard does not support the notion that the court intended to foreclose a future ruling that EEOC cause determinations were per se inadmissible.[3]
 
 
 56
 Finally, and perhaps most significantly, Heard comments negatively upon Smith v. Universal Servs., 454 F.2d 154 (5th Cir.1972), which holds that EEOC cause determinations are per se admissible. The Heard court cites approvingly an opinion dissenting from a refusal to rehear Smith en banc concurred in by 6 of the 15 judges on the Fifth Circuit at the time. The Smith dissent states, "it would seem clear that this type of evidence is not categorically 'probative.' " Smith, 454 F.2d at 160 (Dyer, J., dissenting from denial of petition to rehear en banc). The dissent continued in more damning terms:
 
 
 57
 The credibility of witnesses has historically been the sole function of the fact finder. An opinion concerning credibility by a so-called expert would be superfluous and inadmissible.... The judge, as the fact finder in a Title VII suit, is hopefully more of an expert on the credibility of witnesses than an EEOC investigator.... While an [EEOC] investigator may be an expert in some areas, I cannot conceive how it can be clearly erroneous for a district court to reject his expertise concerning the credibility of witnesses. In addition to its very questionable probative value, EEOC reports may be prejudicial, irrelevant, and unreliable.... It is undisputed that the EEOC report is merely a cumulation of hearsay and contains the opinion of the investigator based upon his credibility choices with respect to the hearsay. Furthermore, it is naive to say that it was not prepared for the purposes of litigation when the report reaches the conclusion that there is a reasonable cause to believe that a violation of the Civil Rights Act has occurred. All of this underscores the report's unreliability and lack of trustworthiness. If we approve this type of hearsay and business record exception, we are establishing a poor precedent that can be equably applied to any other governmental investigative agency. The EEOC investigator is no more, and perhaps much less, of an expert with respect to his investigation that is the IRS or FBI agent.
 
 
 58
 Id. at 160-61. The fact that the Smith dissent was cited approvingly in Heard provides perhaps the strongest precedential basis for concluding that the Heard decision should not preclude this court from concluding that a district court may hold that EEOC cause determinations are per se inadmissible.
 
 
 59
 As a factual matter, the only other case to address the admissibility of cause determinations in the Sixth Circuit, Weems, is not helpful to the EEOC here. This is because Weems involved an EEOC cause determination noting that a Title VII plaintiff's allegations that of retaliatory discharge were unfounded because the Title VII plaintiff had filed complaints with the EEOC only after her discharge. Weems, 753 F.2d at 528 n. 1. The Weems footnote seemed more concerned with demonstrating that the magistrate judge in the case had not considered the cause determination than that he had considered it.
 
 
 60
 We are also not impressed with the precedent from other circuits that the EEOC brings to our attention. First, all of the cases cited by the EEOC stem from the majority opinion in Smith, whereas our circuit, when it initially considered the admissibility of EEOC cause determinations, found the Smith dissent to be more persuasive. See McClure v. Mexia Indep. Sch. Dist., 750 F.2d 396, 399 (5th Cir.1985); Johnson v. Yellow Freight Sys., Inc., 734 F.2d 1304, 1309 (8th Cir.), cert. denied, 469 U.S. 1041 (1984); Plummer v. Western Int'l Hotels Co., Inc., 656 F.2d 502, 504 (9th Cir.1981). Second, the only reasons given by the Ninth Circuit in Plummer for adopting a per se admissibility rule is that the EEOC is an impartial agency and that Title VII plaintiffs have a difficult burden of proof and "should not be deprived of what may be persuasive evidence." Plummer, 656 F.2d at 505.[4] We reject the notion that the EEOC is impartial on the basis of our own analysis, the Smith dissent, and the Fourth Circuit's dicta in Cox v. Babcock & Wilcox Co., 471 F.2d 13, 15 (4th Cir.1972) (noting that the reasons given to exclude EEOC cause determinations in the Smith dissent were "persuasive"). Our analysis leads to the conclusion that the exclusion of an EEOC cause determination does not "deprive" a Title VII plaintiff of the admission of any evidence that the plaintiff is entitled to introduce. The plaintiff remains able to seek the live testimony of witnesses and the inclusion of any documents that should be admitted under the Federal Rules of Evidence. Plaintiffs are not entitled to have admitted evidence that is properly excluded under the Federal Rules of Evidence.
 
 
 61
 In light of our analysis of existing Sixth Circuit and supporting precedent, we hold that a district court does not err as a matter of law by categorically refusing to admit EEOC cause determinations in either bench and jury trials. The district court was, however, premature in holding that it already indisputably had that power under Sixth Circuit precedent.
 
 IV
 
 62
 The contested evidentiary rulings in this case do not justify reversing the district court, and therefore the district court is AFFIRMED.
 
 WELLFORD, Circuit Judge, concurring:
 
 63
 I concur in respect to all issues decided by the court in this case. I write separately on the issue of the non-admission of the EEOC determination letter indicating reason to believe that "race was a factor in the decision" by Ford not to promote Harris. All parties seem to agree that whether to admit the EEOC determination letter is a matter of the trial court's discretion in this circuit. Heard v. Mueller Co., 464 F.2d 190, 194 (6th Cir.1972); Weems v. Ball Metal Division, 753 F.2d 527, 528 n. 1 (6th Cir.1985). In the latter case, it was unclear whether the determination letter was admitted, but it was a bench trial and there was "no indication that the magistrate judge gave the finding any weight." Weems, 753 F.2d at 527 (emphasis added).
 
 
 64
 This was also a bench trial and the district court declined to admit the EEOC report despite acknowledging that the decision was a discretionary one. See Gallin v. Federal Paper Bound, 52 F.R.D. 383 (D.Conn.1970), rev'd in part on other grounds, 479 F.2d 97, 99-100 (2d Cir.1971),[1] for a discussion of reasons why such a determination would not be admitted into evidence even in a bench trial.
 
 
 65
 The district court did state in denying the admission of the EEOC determination into evidence: "It has been my consistent policy not to admit administrative findings of the cases. Therefore, I will not admit Exhibit 5." J/A at 42. The district court indicated a "consistent policy not to admit administrative findings." Taking this rationale in perspective, however, it may be that such a policy was followed in cases pursued by the administrative agency that filed the suit. I find no case allowing into evidence such a report or determination in a case brought by the EEOC itself. I agree with Judge Boggs that particularly in a case brought by the EEOC its "cause determination" is worth "practically zero." The EEOC presents the case, offers the pertinent evidence, and argues to the factfinder and the decider that it should prevail. Why should the cause determination, based upon hearsay and an opinion based on hearsay, be even considered by the court in such a situation to have material value? The district court in this case had the responsibility to decide the credibility of witnesses and the weight to afford exhibits. Under the circumstances, I would find no error in the exclusion.
 
 
 66
 I believe that the Eighth Circuit had it right in deciding this issue in Johnson v. Yellow Freight System, 734 F.2d 1304 (1984), cert. denied, 469 U.S. 104 (1984). In Johnson, the district court admitted the cause determination in a Title VII case brought by an individual plaintiff but did not allow it to be seen or considered by the jury in a separate discrimination claim. The district court in Johnson decided the Title VII claim against the plaintiff. In affirming the judge and the jury decision for defendant, the Eighth Circuit observed that "there is little probative value in the EEOC's conclusionary statements regarding the same evidence [heard/considered by the court]." 734 F.2d at 1309.[2] It also warned of "a danger of unfair prejudice" in admitting the determination. Id.[3]
 
 
 67
 I concur, therefore, in the affirmance, but would limit any per se exclusion of EEOC cause determinations to those cases brought by the EEOC. I would give broad discretion to the district court in other cases as to the fairness and circumstances of admission and the weight to be given such determinations by the EEOC.
 
 
 
 [1]
 This proffer and the other so-called proffers discussed below were not formal written affidavits, but rather verbal summaries by the EEOC's attorneys of what they asserted that the respective witnesses would have testified to if permitted by the district court
 
 
 [2]
 By way of analogy, consider the fact that the Regional Director for the NLRB can bring actions in district court on behalf of the Board for injunctions for appropriate relief pending the final adjudication of the Board when the Regional Director believes that there is reasonable cause to believe that a charge of an unfair labor practice is true. 29 U.S.C. § 160(j). It is true that some deference is shown to the Regional Director's conclusions. See Gottfried v. Sheet Metal Workers Int'l, Local Union No. 80, 927 F.2d 926, 927 (6th Cir.1991) ("Contrary to usual practice, a district court should not attempt to resolve conflicts in the evidence 'if facts exist which could support the Board's theory of liability.' "), quoting Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 29 (6th Cir.1988). However, the entire scheme of the labor laws is to accord deference to the NLRB's determinations. This is implicit in the application of the statutorily mandated "substantial evidence" test to the Board's determinations. 29 U.S.C. § 160(e)-(f). By contrast, the EEOC is not entitled to the deference inherent in the substantial evidence test. Cf. 42 U.S.C. § 2000e-5(f)(1) (giving the EEOC the power to bring suits, but not requiring the application of any deferential standard of review to its findings of fact)
 
 
 [3]
 The Gillin ruling was affirmed on appeal. The Second Circuit held there was no prejudice in excluding the EEOC's entire report in that case. However, it pointed out in dicta that it was acceptable to admit a summary of the complete EEOC file on the case. It also noted that the district judge in Gillin had actually allowed a summary of the EEOC's investigation consisting of no more than one to two pages to be admitted into evidence. Nevertheless, what happened at trial and what happened on appeal in Gillin cannot elucidate what the Heard court had intended to establish as the law of the Sixth Circuit, as neither the appellate opinion nor the outcome of the trial in Gillin were available to the Heard court
 
 
 [4]
 Plummer also cites Chandler v. Roudebush, 425 U.S. 840, 863 (1976) (holding public employees have the same right to trial de novo in Title VII cases as private employees), for the proposition that prior administrative determinations are admissible evidence. Plummer, 656 F.2d at 504. First, Chandler does not address evidence admissibility in trials de novo in Title VII actions. Second, Chandler involved an administrative proceeding before the Civil Service Commission (CSC), not the EEOC. The EEOC, by contrast to the CSC, is empowered to bring Title VII actions on behalf of aggrieved private parties, and obviously has a mission to vigorously enforce the civil rights laws which it fulfills by carefully choosing the cases it will litigate in the federal courts
 
 
 [1]
 Cited in Heard v. Mueller Co
 
 
 [2]
 The court also stated that the value of such an EEOC determination in a private case was "minimal." Id. at 1310
 
 
 [3]
 The EEOC forthrightly observed in its brief, p. 27, that a contrary decision to admit "would not likely provide the basis for reversal of the district court's judgment."